# CHARLESTON.

'CLARKSBURG LIGHT & HEAT COMPANY v. PUBLIC SERVICE COMMISSION OF WEST VIRGINIA

Submitted September 17, 1919.  Decided October 7, 1919.

1. PUBLIC SERVICE COMMISSIONS—*Classification of Public Utility Rates Proper*

   For the purpose of fixing the rates to be charged by a public utility, it is proper to place its patrons in different classes, and make different rates applicable to such classes based upon the varying cost of the service rendered.  (p 643).

2. GAS—*Light and Heat Corporations Subject to Regulatory Power of Public Service Commission.*

   · A corporation engaged in the business of supplying gas for light, heat and power to the inhabitants of a city is subject to the regulatory power of the Public Service Commission.  (p. 644).

3. PUBLIC SERVICE COMMISSIONS—*What Constitutes "Public Service Utility" Defined.*

   The use which the consumer makes of the commodity furnished does not constitute the test as to whether or not the regulatory powers of the Commission in dealing with public utilities may be invoked. It is the duty which the purveyor or producer has undertaken to perform on behalf of and so owes to the public generally, or to any defined portion of it, as the purveyor of the commodity, or as an agency in the performance of the service which stamps the purveyor or the agency as being a public service utility.  (p. 644).

4.  CONSTITUTIONAL LAW—*That Legislature Has Designated Certain
    Business Subject to Public Service Commission not to be
    Disregarded.*

    Where the legislature has declared a .certain business subject to
    regulation by the Public Service Commission, such declaration will
    not be disregarded by this Court, unless it appears that there is
    no substantial basis for holding that the business is of that char-
    acter which is subject to regulation by the Public Service
    Commission.   (p. 644).

5.  SAME—*Public Utilities—Regulatory Power of State.*

    Whenever any business or enterprise becomes so closely and
    intimately related to the public, or to any substantial part of a
    community, as to make the welfare of the public, or a substan-
    tial part thereof, dependent upon the proper conduct of such bus-
    iness, it becomes the subject for the exercise of the regulatory
    power of the state.   (p. 644).

6.  GAS—*Charges for Gas—Regulation by Public Service Commission.*

    A corporation engaged in the business of supplying gas to
    the inhabitants of a city for the purpose of light, heat and power,
    is subject to have the rates it charges therefor to all of its pa-
    trons regulated by the Public Service Commission, notwithstand-
    ing some of such patrons may be engaged in manufacturing
    enterprises.   (p. 646).

7.  PUBLIC SERVICE COMMISSIONS—*Part of Receipts Allowed Yearly
    for Amortization of Plant.*

    Where the life of a public utility is determined by the ex-
    haustion of the supply of the material which it furnishes to the
    public, such part of its receipts each year should be allowed for
    the amortization of the plant as will return to the stockholders
    their investment within the probable life thereof.   (p. 649).

8.  GAS—*Dividends of Natural Gas Company Treated in Part as Re-
    turn of Capital.*

    The dividends paid to the stockholders by a natural gas com-
    pany whose life is determined by the life of the gas fields from
    which it obtains its supply, cannot in their entirety be treated
    as earnings, but such part thereof as will repay to the stock-
    holders their investment within the probable life of the plant
    must be treated as a return to them of their capital.   (p. 649).

9.  PUBLIC SERVICE COMMISSIONS—*Rate Determined by Misapplica-
    tion of Law to Facts Reviewed.*

    The business of rate making, being legislative in its character,
    a rate based upon a fact determined to exist by the rate-making

power, will not be reviewed because of an improper finding based upon disputed facts, but where such fact has been determined by a misapplication of legal principles to the state of facts shown, such finding will be corrected by applying correct legal principles to such state of facts.   (p. 653).

10. GAS—*New Pipe Lines of Natural Gas Company Investment, and Not Expenses of Operation.*

Expenditures of a natural gas company for pipe lines from new wells which will be used during the life of such wells are properly included as an item of investment, and are not properly chargeable as an item of expense of operation.   (p. 653).

(LYNCH, JUDGE, absent.)

Original petition by the Clarksburg Light & Heat Company for suspension of an order of the Public Service Commission fixing a schedule of rates.

*Order of suspension refused.*

*R. S. Douglass* and *Melvin G. Sperry*, for petitioner.

*Geo. W. Johnson, Law & McCue, Glasscock & Glasscock, J. A. Meredith,* and *Hoffheimer & Templeman* for respondent.

RITZ, JUDGE:

The Clarksburg Light & Heat Company has for a number of years been engaged in producing, transporting, distributing and supplying natural gas for public use in the city of Clarksburg.   In July, 1917, it filed with the Public Service Commission a schedule of rates which it proposed to charge for gas thereafter supplied, which was an advance over the rates then charged.   Several of the company's patrons filed objections to the said rates, and the schedule was suspended pending a hearing as to the reasonableness of the rates.   Before this hearing was completed, to-wit, on the 9th of November, 1917, the gas company filed an amended petition containing another classification and schedule of rates.   These rates were an increase over those proposed in the first schedule.   Objections were also filed to this amended schedule by a number of patrons of the company.   A temporary schedule was made by the Commission on the 4th of December, 1917.   This order of the Commission classified the com-

pany's service as follows:   Class 1.—Domestic Consumers.
In this class are placed all consumers using gas for house-
hold purposes, and all other consumers whose use of gas
varies according to the season of the year, but who cannot at
any season or time be shut off, either temporarily or per-
manently, for the purpose of giving household consumers
a sufficient supply of gas; in which is included restaurants,
storerooms, and the cooking, heating and lighting parts of
hotels.   The rate allowed for the service to this class was
eighteen cents per thousand cubic feet.   Class two includes
city buildings and city utilities, county buildings and school
houses where gas is used under boilers and as in manufactur-
ing plants, upon the condition that the company has a right
to shut off the gas to keep domestic consumers supplied.
The rate for this class is fixed at ten cents per thousand
cubic feet net for the first one million cubic feet consum-
ed in a calendar month, and six cents per thousand cubic
feet net for the quantity over one million cubic feet consum-
ed in a calendar month.   Class three includes manufacturers
and other large consumers who may be shut off immediately
in order to provide an ample supply to the consumers in
class one.   The rate for this class was fixed at fifteen cents
per thousand feet for the first two hundred thousand cubic
feet, or part thereof, thirteen cents for the next three hun-
dred thousand cubic feet, or part thereof, and twelve cents
for all gas in excess of five hundred thousand cubic feet.
This order of the Commission was temporary in its nature,
and the application was retained before the Commission for
final hearing and determination at a later time.   Before
any final order was had the gas company, on the 10th day
of October, 1918, filed a second amended petition, in which
it submitted an amended classification and a schedule
of increased rates, which new classification and new rates
it proposed to make effective in November of that year.   By
this amended classification class one was made to include
certain service which was then included in class two, such
as city buildings, county buildings, school buildings, and
other quasi public service, and class two was limited to such
consumers as were at that time included in that class, exclud-

84 W. Va.

ing those attempted to be placed in class one.  Class three was the same as formerly, but provision was made for the discontinuance of service to this class entirely, except upon contracts made with such consumers by the gas company.  The rates proposed in the new schedule were thirty cents per thousand cubic feet for class one, twenty cents per thousand cubic feet for class two, and for class three such rates as might be fixed by contract.  Hearings were had upon this application, and on the 15th day of April, 1919, the Commission entered an order declining to allow the gas company to adopt the changed classification, but allowing an increase in rates above those then in effect, fixing the rates for consumers in class one at twenty-two cents per thousand cubic feet, less two cents for payment on or before the 10th of the month following that in which the gas is consumed; fourteen cents per thousand cubic feet for consumers in class two; twenty cents per thousand cubic feet for the first two hundred thousand cubic feet, or part thereof, eighteen cents per thousand cubic feet for the next three hundred thousand cubic feet, or part thereof, and sixteen cents per thousand cubic feet for all over five hundred thousand cubic feet for consumers in class three, with a discount of one cent per thousand cubic feet to such consumers if payment was made on or before the 20th of the month next following that in which the gas was used; further providing that the service might be discontinued at any time to consumers in classes two and three when it became necessary to do so in order to furnish an adequate supply of gas to the consumers of class one.  From this order of the Commission the gas company prosecutes this appeal, contending: first that the Commission was not authorized to include in this schedule of rates gas furnished by it to manufacturing plants under class three, for the reason that the same is not a public service, and that its dealings with such concerns are not subject to control by the Commission; second, that the rates allowed by the Commission upon any theory of the case are confiscatory of the petitioner's property, not yielding to it a reasonable return upon the value of the property devoted to the public service; and further that the Commission unauthorizedly refused to allow it to

adopt its new classification to the extent that it attempted to transfer certain consumers from class two to class one.

The effect of the proposed new classification, as above shown, would have been to transfer from class two to class one such consumers as school houses, public buildings, and other like institutions, and impose upon such consumers the rates prescribed for consumers of the first class. The petitioner contends that its regulations in this regard were reasonable, and that the Commission should have allowed it to place such consumers in class one. It is contended that such a regulation made by a public utility for the conduct of its business cannot be interfered with by the Commission unless the same is unreasonable, and the case of *Baltimore & Ohio Ry. Co.* v. *Public Service Commission,* 81 W. Va., 457, is relied upon as authority to support this contention. In that case we had under consideration the reasonableness of a regulation adopted by the railway company classifying its shippers of coal for the purpose of car distribution, and we held the regulation proposed reasonable and denied the power of the Public Service Commission to annul it. That regulation had no effect upon rates. But can it be said, in view of the past conduct of the petitioner's business that the proposed change in classification is a reasonable one? There is a difference in the rate charged to consumers in the various classes, and this difference in rates is based upon a difference in the cost of the service to the consumers of the several classes. While it costs the same amount to produce each unit of gas, no matter to whom it is delivered, it does not cost as much to deliver it, to collect for it, and to do the other things necessary to render the service in all cases. Where a large quantity is delivered to a consumer the expense of reading meters, bookkeeping and collection, as well as other like expenses, is very much less per unit than it is where an equal amount is delivered to a large number of consumers, and it is largely upon this theory that the difference in rates is justified. It appears that at least for some years these public buildings and other like institutions consuming large quantities of gas have been given a rate less than domestic consumers, and we are of opinion that the

Public Service Commission was entirely justified in saying that the attempt of the company to raise the rate to these consumers by putting them in another classification was unreasonable, inasmuch as it is entirely apparent that the cost of the service to this class of consumers for each unit of gas furnished is not as much as to those consuming gas in much smaller quantities.

The petitioner earnestly contends that the Public Service Commission has no authority to regulate the rates to be charged by it to its manufacturing consumers. It contends that this is not a public service, and is not subject to the regulatory power of the state, and that the order of the Commission fixing the rate to be charged by it to such consumers is without authority of law. It cannot be doubted that the language of the Act conferring jurisdiction upon the Public Service Commission to regulate the business of public service corporations is broad enough to include the petitioner, for section 3 of the Act provides: "The jurisdiction of the Commission shall extend to gas companies, electric lighting companies and municipalities furnishing gas or electricity for lighting, heating or power purposes." And section 7 provides: "That it shall be unlawful for any public service corporation subject to the provisions of this Act to make or give undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality or any particular character of traffic or service in any respect whatsoever, or to subject any particular person, firm, corporation, company or locality, or any particular character of traffic or service to any undue or unreasonable prejudices or disadvantages in any respect whatsoever." This language, it appears, is broad enough to embrace the activities of the petitioner, and all of them. But petitioner's contention is that the legislature did not have power to make of it a public service corporation, or to make any part of its business subject to the regulatory power of the Commission, unless the nature of the business was such as to make it subject to the police power of the state. It is quite true that the legislature cannot arbitrarily convert a private business into a public one for the purpose

of regulation, unless there is a substantial basis for the exercise of the police power. The question of whether any particular business comes within the regulatory power of the legislature, or the Public Service Commission in this case as the agent of the legislature, in the last analysis is one for the courts to determine. In reaching a conclusion, however, the public policy of the state as announced by the legislature will be given due weight, and the determination of the legislature that a particular business is subject to the regulatory power of the state because the public wellfare is dependent upon its proper conduct and regulation will not be lightly disregarded by the courts. *People* v. *Budd,* 117 N. Y. 1; *German Alliance Ins. Co.* v. *Kansas,* 233 U. S. 389. The increasing population of the country, closer relations existing between its inhabitants, brought about not only by the increase in population, but the more efficient means of communication, has rendered in recent years many lines of enterprise subject to public regulation which in the past had been considered matters of purely private concern. *Munn* v. *Illinois,* 94 U. S. 113; *People* v. *Budd,* 117 N. Y. 1; *German Alliance Ins. Co.* v. *Kansas,* 233 U. S. 389; *Pinney & Boyle Co.* v. *Gas & Electric Co.,* 168 Calif. 12. And it cannot be doubted that in the future, as the relations of our ever-increasing population grow more intimate and interdependent, many businesses and enterprises which are at this day considered as entirely of private concern and beyond the power of the public to regulate will become subject to control under the police power. The fact that the conduct of any particular enterprise may have in the remote or even recent past been considered as entirely the subject of private contract, while persuasive of the private charter of the business, is not at all conclusive. Of course it is very well recognized that in order to make any particular business subject to the police power it must be affected with a public interest. Not only must the service offered be available to anyone who applies for it, but anyone who desires it must have the right to demand it upon complying with proper regulations, and the payment of proper charges therefor. It must be such a business as the public authorities have a

right to subject to the regulatory power of the state for the benefit of its inhabitants, and the question in this case is, is the petitioner's business such a one? When does any particular enterprise or line of business fall within the regulatory power of public authority? From what we have said it is apparent that no rule can be laid down which can be followed blindly or arbitrarily over any period of time. The ever-changing conditions of modern business, and the constantly varying relations of the public to such business, make necessary the extension of this power in the interest of the public to such businesses as may by their conduct decidedly influence for weal or for woe the general welfare of the community. And it may be said that whenever the relation of any business or enterprise to the public, or to any substantial part of a community becomes so close as to make the welfare of the public, or any substantial part of it, depend upon the proper conduct of such business, then it becomes a subject upon which the regulatory power of the state may be exercised for the benefit of the whole, and the determination by the legislature that a particular business belongs to such class will not be set aside where there is a substantial foundation for it. This question is very elaborately discussed by Mr. Chief Justice Andrews in delivering the opinion of the court in the case of *People* v. *Budd,* 117 N. Y. 1, and by the Supreme Court of the United States in the case of *German Alliance Ins. Co.* v. *Kansas* above cited. In the latter case Mr. Justice McKenna reviews the authorities at length and discusses the question here involved with great perspicacity and we cannot do better than to suggest to the interested inquirer a careful persual of the Court's opinion in that case.

Having established this general principle, the remaining question is, does the business of the petitioner so affect the interest of the community as to make it subject to public regulation so far as it furnishes gas to manufacturing enterprises? It must be borne in mind that petitioner is furnishing large quantities of gas, not only to these private enterprises, but to all of the people of Clarksburg desiring it. If it is subject to public regulation in supplying its product to one class of consumers, such as domestic consumers, or to

school houses or public buildings, it cannot very well be conceived how the supplying of its product to other consumers in the same community can be placed upon a different footing. It is argued that the business in which these manufacturing consumers are engaged is entirely private; that the public has no interest therein, no power to regulate it or control it, and this is entirely true, but that argument applies with equal force to every private residence in the city. The public has no right or power to control the conduct of family life. It is as much, if not more, a private use of gas when it is consumed by a domestic consumer as when it is consumed by a manufacturing plant. The use made of the substance by the consumer is not the test. If such were the case, then the public service would only extend to such of the petitioner's product as is furnished to purely public institutions, in which class might be placed courthouses, school houses, and public buildings of that character, and all other of its business would be free from regulation by the public authorities. Bearing in mind that the legislative intent has been expressed in regard to the business of this petitioner with reasonable clearness to the effect that the same is subject to the regulatory powers of the Commission, in order to overturn that expression of legislative intent we must find that the public welfare is not so intimately connected with petitioner's business as to require the public regulation of it. Here we find a gas company supplying the inhabitants of one of the principal cities of the state with an article of prime necessity for their welfare. We find a great number of manufactories, great and small, upon which the life of that city largely depends, being supplied by petitioner with gas for fuel purposes. Necessity demands that these enterprises be allowed to conduct their business without being subjected to any undue or unreasonable disadvantage one over the other. When rival business enterprises locate in a community, can a public service corporation engaged in supplying fuel to the inhabitants of that community, be permitted to say, we will supply fuel to one of these plants, and will subject the others to the necessity of procuring fuel of another kind at a largely increased cost? Such a holding in the end is bound to result in the petitioner

not only having a monopoly in the business of selling gas in which it is engaged, but in creating a monopoly for the benefit of such private manufacturer, or manufacturers, as it might choose to favor with its supply of gas to the prejudice of those who are forced to supply themselves with other fuel or discontinue their business. It is argued that the supply of gas to these manufacturing plants is nothing but the sale of the petitioner's product to them. It is true that it is the sale of the gas produced by the petitioner, but it is more. It is the delivery of the same at the point of consumption. For the purpose of this delivery the petitioner under our law is a public servant. It exercises the power of eminent domain for the purpose of securing rights-of-way for its pipe lines. It extends the same over the public highways and streets, and appropriates them to its uses, as it contends partly for the public good, but partly purely for private ends. The duty of the petitioner to supply the public with gas is its paramount duty. It makes no difference who that public is, or to what use the gas is to be appropriated. If the petitioner was allowed to conduct one-half of its business under public regulation, and to sell the other half of its product upon private contract, the result would be disastrous to the public for the rates charged to private consumers would control those charged to the public consumers, or vice versa. The intricate accounts which would have to be kept in order to indicate the proper part of the company's expenses chargeable to the one or the other part of its business would be so easily manipulated that in the end the so-called private consumers would either be paying largely for the public service or the public consumer would in a large measure be paying for the gas furnished for manufacturing purposes. No one can serve two masters is as true today as it was two thousand years ago, and it cannot be doubted that, if this petitioner is allowed to divide its allegiance in the manner desired, the service rendered by it to the class of its patrons, which it would soon despise would be inefficient and ineffective to meet their reasonable demands, to the end that the needs of that other class of patrons which had secured

its favor might be the more efficiently met. We are clearly of the opinion that so long as the petitioner is engaged in supplying gas to the public in the manner in which it is at this time it cannot supply a part of that public under private contract, and a part of it under public regulation.

The petitioner contends that the rates prescribed by the Public Service Commission amount practically to the confiscation of its property, and this conclusion is reached upon the theory that the pretitioner's plant is not of the character of the ordinary public service utility, for the reason that its life is not perpetual, but is limited by the life of the gas field from which it procures its gas. It shows that its production of gas in 1916 was 10.41 per cent. less than in 1915; that its 1917 production was 11.43 per cent. less than the 1916 production; and the production for 1918 17.83 per cent. less than the 1917 production, and argues that the fair deduction from these figures is that certainly in five or six years its gas supply will be exhausted, and its plant worthless, wherefore the Commission should have provided rates which would produce a revenue sufficient to amortize the plant within that time, as well as pay a return upon petitioner's investment. The Commission, in arriving at a basis for the rates prescribed by it, valued petitioner's properties at fifteen hundred thousand dollars, and then after providing for all of its proper expenses allowed $120,000.00 as a return upon this investment, and $150,000.00 for amortization of the plant. The contention of the petitioner is that instead of allowing $150,000.00 for this purpose, there should have been allowed practically twice that sum, and assuming that the valuation of the plant is correct, and that it will become obsolescent in five or six years, its contention is perhaps correct. It cannot be doubted that in fixing the rate to be charged by a public utility such as the petitioner, there is an element to be considered which does not ordinarily enter into the matter of rate making. Public utilities such as water companies, or light companies are considered upon the theory of perpetual life, and when the proper return is allowed upon the investment and a proper amount for maintaining the physical properties in effective

condition, the public utility has no ground for complaint, but where as in this case the life of the utility is determined by the exhaustion of its gas fields there must be in addition to the allowance for interest on the investment, and for the expense of keeping the plant in effective condition, another item sufficient to amortize the plant within the probable life of the field from which the gas is obtained. In order to determine whether or not the Public Service Commission has adequately allowed for this purpose it is necessary to review the fiscal history of the petitioner. It was organized in the year 1904 by the consolidation of two gas companies then doing business in the city of Clarksburg. While its capital stock was fixed at $200,000.00 at that time, it is shown that the properties actually owned by the newly-organized company were worth approximately $650,000.00. These properties consisted largely of leases upon gas and oil territory and gas-producing wells. From the year 1904 to the year 1914 inclusive it appears that this company had a net corporate income of $1,451,954.28; that it declared in dividends during that time the sum of $738,500.00; that in addition to this it issued during that period $300,000.00 of bonds which it delivered to its shareholders, retiring $100,000.00 of its stock, giving to the holders of its stock $300.00 of these bonds for each share of stock surrendered; that it subsequently retired these bonds out of its income, together with their interest, which amounted in the aggregate to $336,140.00. This amount was, of course, in effect a dividend to the stockholders, and indicates that during that eleven-year period it paid out to its stockholders in dividends more than a million dollars. Its statement shows that for the years 1904, 1905, 1906, 1907, and 1908 it made no deductions from its capital account for depreciation of its plant, or for the purpose of amortizing its investment. For the year 1909 it deducted practically $81,000.00 for all purposes; for the year 1910, $29,500.00; for the year 1911, nothing; for the year 1912, $21,000.00; for the year 1913, $45,000.00; and for the year 1914, $124,800.00, or a total of a little over $300,000.00 in eleven of the most prosperous years of its history, not only on account of depreciation in the physical properties,

but for the purpose of amortizing its plant because of the exhaustion of the gas fields owned by it.  Thus it will be seen that during these eleven years the petitioner itself allowed less than $30,000.00 a year to accomplish a purpose for which it now claims $150,000.00 a year is entirely inadequate, and the record shows that during those years, or at any rate during the later ones, the production and sale of gas was more than it has been in the last few years, and more than can reasonably be expected in the succeeding years.  While it is true that in fixing the rate for a public utility such as the petitioner, regard must be had to the fact that its plant will only have a salvage value when its gas supply is exhausted, it is likewise true that the petitioner must be considered to have taken this into consideration during all the life of the plant. Assuming that the petitioner's contention is correct, that its plant will become obsolescent in five years, it would be manifestly unjust to charge those who consume the gas during that last five years with practically the entire cost of the plant, in addition to a reasonable return upon the entire investment therein.  The dividends heretofore declared amount to much more than a reasonable return on the investment. They amount to from forty to fifty per cent. on the amount of money actually invested, as contended for by the petitioner, and to more than one hundred per cent. on the nominal capital stock.  These dividends it cannot be considered were declared out of earnings.  It is true they were declared out of the company's receipts from the sale of its gas and the service it performed in delivering it.  Such part of these receipts as may properly be construed to be for the purchase price of the gas should have been treated as in effect purchase money for its property, and its capital have been depreciated to that extent.  In other words, in order to arrive at a just conclusion as to what is a proper allowance to be made for amortizing the investment we must consider that this process has been going on during the whole life of the plant.  It will not do to say that this company could by continued active operations for the first half of its life exhaust more than one-half of its gas supply, and declare the whole of it in dividends as profits on its investment, and

then begin the amortization of the investment after its property had been thus depleted. If we assume that the petitioner's investment amounted to $1,500,000.00, or even $2,-000,000.00 as contended for by it, in order to make which amount, however, the original investment has to be more than doubled because of the appreciation in the value of its properties, we must then assume that during all the time it has been operating and withdrawing gas from its field, and selling the same to its customers, it has been not only earning money, but it has been selling a part of its property, and we must depreciate its investment each year of its existence to the extent of such sales. Of course, as is stated by the Commission in the case of *In re United Fuel Gas Co.,* Public Utilities Rep. 1918, C., p. 193, it is a practical impossibility to determine how much should be taken from the capital investment each year because of depletion of the gas supply for that particular year, and the proper way, and perhaps the only possible way, is to distribute over the entire life of the utility the total amount of its investment. In other words, divide the total investment into the number of years of the utility's probable life, and depreciate the investment each year by the amount thus found. If in this case we fix the total investment at $2,000,000.00, and to do this we are required to more than double the investment actually made because of appreciated value of the property, and divide this amount by twenty years, the probable life of this utility, we find that the investment should have been depreciated each year to the extent of $100,000.00 because of exhaustion of the supply of gas by the sales made therefrom. Instead of doing this, as we have before stated, the company during the first eleven years of its life only depreciated it to the extent of $300,000.00, when in fairness the investment should have been depreciated down to the year 1914, when the Public Service Commission began to regulate it, to the extent of at least $1,000,000.00. It will thus be seen that instead of the Public Service Commission fixing too small an amount for the proper amortization of the investment, they have fixed it larger than might be justified, but this was partly upon the theory that for the last two or three

years the petitioner had not been allowed to earn enough to set aside any amount for this purpose.    It may be urged that we cannot go behind the Commission's finding that this plant is worth $1,500,000.00 as a public utility at this time; that the findings of fact of the Commission in this regard are conclusive upon us.    It is quite true that rate making is the exercise of legislative power, and where it depends upon the ascertainment of results from disputed facts, the determination of the legislature or, in this case, the Public Service Commission in lieu thereof, will not be reviewed, but where such determination is reached by a misapplication of legal principles to the state of facts disclosed this Court will make a correct application of such principles in determining whether or not the rate fixed by the legislative authority is confiscatory.    We are, therefore, of the opinion that had the Commission applied a proper proportion of the petitioner's receipts for the years 1904 to 1914 inclusive to the reduction of its investment instead of treating practically the whole thereof as earnings, the value of this plant at this time would have been found to be less than it was by the Commission.    In other words, by the application of the legal principle we have above laid down, to the state of facts which it is conceded exists here, the investment of the stockholders in the petitioner had been more than fifty per cent. returned to them by the year 1914, and the investment in the plant should have been reduced to that extent.    We think the Commission has dealt as liberally with the petitioner in the matter of allowing for the amortization of its plant as could reasonably be expected.

Complaint is made that the Commission did not allow the petitioner as expenses an item of $160,000.00 to cover the cost of new field lines.    It appears that the petitioner, in order to keep up its supply of gas, and to exhaust its field, is constantly drilling new wells and laying new lines thereto, and it contends that the cost of these new lines should be allowed to it as an item of expense to be returned in the year in which made, instead of being added to its investment.    The Commission treated this item in the same manner that it had been treated by the petitioner during all of its

·existence. A large part of its investment, as now appears ·upon its books, is made up of such items as this, all of ·which were expended out of its receipts, and we think it ·would be manifestly unjust to charge consumers of gas in :any one particular year the total cost of laying pipe lines which will be used to convey the gas from these wells during ·their entire life.

Our conclusion is to refuse to suspend the order of the Pub- ·lic Service Commission.

*Order of suspension refused.*