UNITED FUEL GAS COMPANY, *a Corporation*

*v.*

G. THOMAS BATTLE, *Tax Commissioner* OF WEST VIRGINIA

(No. 12706)

Submitted April 30, 1968.          Decided April 3, 1969.

Concurring Opinion April 23, 1969.

Rehearing Denied June 24, 1969.

224

*C. Donald Robertson,* Attorney General, *William F. Carroll,* Assistant Attorney General, for appellant.

*R. K. Talbott, Herbert W. Bryan, H. L. Snyder,* for appellee.

*Howard R. Klostermeyer,* amicus curiae for E. I. du Pont de Nemours.

*E. Glenn Robinson,* amicus curiae for Kaiser Aluminum.

HAYMOND, JUDGE:

This is an appeal upon the application of the defendant, G. Thomas Battle, Tax Commissioner of the State of

West Virginia, hereinafter sometimes referred to as tax commissioner or commissioner, from the final judgment of the Circuit Court of Kanawha County rendered April 21, 1967, which affirmed in part and reversed in part certain business and occupation tax levies imposed by the defendant against the plaintiff, United Fuel Gas Company, a corporation, hereinafter sometimes referred to as United Fuel. The taxes levied by the commissioner amounted to $971,167.37 and the penalties imposed amounted to $353,186.02, or a total amount of taxes and penalties of $1,324,353.39.

The issues presented to the circuit court upon the appeal to that court from a reassessment made by the commissioner are set forth in an agreed stipulation and are designated as agreed issues Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14. By its final judgment the circuit court reversed the action of the commissioner on these agreed issues: Issue No. 1, dealing with free gas furnished the lessor by the plaintiff as lessee in certain oil and gas leases held by the plaintiff; Issues Nos. 2 and 3, relating to sales of gas in interstate commerce; Issue No. 10, relating to imported gas, supplied or furnished by the plaintiff under special industrial sales agreements to E. I. du Pont de Nemours and Company, Kaiser Aluminum and Chemical Corporation, and Elk Refining Company; Issues Nos. 12 and 13, relating to the penalties imposed by the commissioner, and affirmed the action of the commissioner on agreed Issues Nos. 4, 5 and 6, relating to gas produced in West Virginia and purchased and sold by the plaintiff to West Virginia customers; and Issues Nos. 7, 8 and 9, relating to certain sales of gas by plaintiff to certain industrial consumers.

The circuit court found that Issue No. 11 did not relate to any present claim or justiciable controversy but was merely indicative of possible future disputes and accordingly rendered no decision on that issue, and rejected the contention of the plaintiff on Issue No. 14 that the business and occupation taxes involved in this proceeding

covering the five year period 1957 to 1961 were barred by the provisions of Section 19a, Article 2, Chapter 55, Code, 1931, as amended.

By its final judgment the circuit court on Issues Nos. 4, 5 and 6 upheld the commissioner's levy of $3,209.84, on Issues Nos. 7, 8 and 9 upheld the commissioner's levy of $84,714.19, and on Issue No. 1, relating to certain free gas which the plaintiff concedes is taxable, the circuit court allowed $4,158.19 and on oil production, tank car rentals and royalties allowed $167.01, entered judgment upon the total of the foregoing levies in the amount of $92,249.23, and remitted all penalties imposed by the commissioner. The circuit court denied the motions of both parties to set aside the foregoing judgment and to rehear and reconsider its ruling upon the issues determined and also denied the motion of the commissioner to substitute in lieu of the judgment of $92,249.23, a judgment against the plaintiff for taxes in the sum of $971,167.37 and penalties in the sum of $353,186.02, aggregating the sum of $1,324,353.39. From the foregoing judgment this Court awarded this appeal and supersedeas upon the application of the commissioner. On this appeal the commissioner seeks reversal of the action of the circuit court on Issues Nos. 1, 10, 12 and 13, and the plaintiff, by cross-assignment of error, seeks reversal of the action of the circuit court upon Issues Nos. 4, 5, 6, 7, 8 and 9.

The statutes directly involved in this proceeding are Sections 2, 2a, 2c and 2d, Article 13, Chapter 11, Code, 1931, as amended.

The plaintiff, a West Virginia corporation and a public utility subject to regulation by the Public Service Commission of this State and the Federal Power Commission, is primarily engaged in the production, transmission, distribution and sale of natural gas, both at wholesale and retail, in this State, and is also engaged in the sale and the leasing of certain tangible property. During the year 1961, which is the year stipulated by the parties as

the typical year to illustrate the layout, structure and facilities of the plaintiff, the plaintiff served an average of 118,458 residential, commercial and industrial consumers from its distribution systems with 24,928,857 Mcf of natural gas, 26 industrial customers from other than local distribution systems with 14,208,393 Mcf of natural gas, and it sold to 14 other companies 210,920,363 Mcf of natural gas for resale, both inside and outside this State. The greater portion of the total volume of natural gas sold by the plaintiff, both at wholesale and retail, in West Virginia is imported into this State and consists of southwestern gas produced in Texas and Louisiana and to a lesser extent in Kentucky and Virginia. During the year 1961 of the total volume of natural gas entering plaintiff's pipelines in Kentucky, Virginia and West Virginia, 82% was southwestern gas, 7% was Kentucky and Virginia gas and 11% was gas produced in West Virginia. The plaintiff obtained the southwestern gas by two methods (1) by purchasing the gas from Tennessee Gas Transmission Company which acquired the gas from wells in Texas and Louisiana and transported it through that company's pipelines to points in West Virginia and Kentucky and (2) by the plaintiff's own purchase of natural gas for resale from wells located in southern Louisiana and transported by pipelines owned and operated by Columbia Gulf Transmission Company to the plaintiff's facilities at various points in Kentucky, from which points the gas was brought into West Virginia by the pipelines of the plaintiff. Approximately 80% of the property of the plaintiff used in its integrated system in 1961 was located in this State and the total depreciated original cost of all such property was $165,786,314.00 and the portion in West Virginia was valued at $132,892,508.00. Its property includes producing oil and gas wells, compressor stations, regulators, meters, various sizes of pipelines, underground storage fields, products extraction plants, machinery, office furniture and equipment, and other assets. In 1961 it employed 2200 persons in West Virginia and its gross income from all sales of gas in

that year was $214,673,623.00 and from gas sales of all types at West Virginia delivery points amounted to $109,465,235.00. The business activities of the plaintiff in this State involved in this appeal are the production of natural gas and the sale by plaintiff under special contracts to various industrial consumers, among them E. I. du Pont de Nemours and Company, Elk Refining Company and Kaiser Aluminum and Chemical Corporation, which are served with natural gas imported into this State and delivered through plaintiff's transmission lines. Other industrial consumers in this State are supplied with natural gas which is delivered from its distribution pipelines and plants.

After an audit of the business activities of the plaintiff in this State the defendant on December 10, 1963, issued an original assessment of business and occupation taxes against the plaintiff in the sum of $1,782,550.88 and imposed a penalty in the sum of $642,437.69 or a total of $2,424,988.57 for the period 1957 to 1961, inclusive. After the plaintiff was served with that assessment it filed a petition for a reassessment of the tax and penalty on January 9, 1964 and assigned numerous errors in such assessment. The defendant conducted an administrative hearing upon the petition and by a ruling of May 18, 1965 served upon the plaintiff on May 26, 1965, the defendant reduced the claim against the plaintiff for business and occupation taxes from $1,782,550.88 to $971,167.37 and imposed a penalty upon that amount of $353,186.02 or a total of taxes and penalties of $1,324,353.39 for the assessment period 1957 through 1961.

On June 24, 1965, the plaintiff appealed the ruling of the defendant to the Circuit Court of Kanawha County by serving the defendant with written notice of such appeal and filing the notice in the office of the Clerk of the Circuit Court, and in the notice assigned numerous errors in the rulings of the defendant. By his answer filed July 20, 1965, the defendant denied the allegations of error set forth in the notice. The facts and the issues

have been stipulated and, there being no substantial factual dispute, the case was submitted to the circuit court on April 18, 1966 for decision upon the notice of appeal, the answer of the defendant, the stipulation between the parties and eight volumes of stipulated exhibits. By its final judgment rendered April 21, 1967, the circuit court resolved Issues Nos. 1, 2, 3, 10, 12 and 13 in favor of the plaintiff and Issues Nos. 4, 5, 6, 7, 8, 9 and 14 in favor of the defendant, set aside the penalty imposed, and entered judgment in favor of the defendant and against the plaintiff for $92,249.23, with interest from the date of the judgment. The circuit court also prepared a lengthy memorandum of opinion which is filed as part of the record in this proceeding.

On April 30, 1968, this appeal was heard in this Court and this proceeding was submitted for decision upon the transcript of the record in the circuit court, including the pleadings, the written briefs as amici curiae by counsel for E. I. du Pont de Nemours and Company and by counsel for Kaiser Aluminum and Chemical Corporation, and the printed briefs and the oral arguments of attorneys in behalf of each of the parties.

The defendant assigns as error the action of the circuit court in deciding Issues Nos. 1, 10, 12 and 13 for the plaintiff and against the defendant, and in denying the motion of the defendant that the judgment for $92,249.23 be set aside, its motion for rehearing and reconsideration of the action of the circuit court upon Issues Nos. 1, 10, 12 and 13, and its motion for a new judgment for the amount of the taxes and the penalty claimed by the defendant.

Issue No. 1 involved the question of the taxability under Section 2a, Article 13, Chapter 11, Code, 1931, as amended, as a part of the production of gas by plaintiff, of free gas delivered by the plaintiff to its lessors from the wells of the plaintiff on lands of the lessors pursuant to covenants in oil and gas leases, such free gas having been taken by the lessors before measurement of the gas

at its wells to determine the amount of the gas royalty to be paid to the lessors by the lessees.

Section 2a, relating to the tax imposed by Section 2, to the extent here pertinent, provides that: "Upon every person engaging or continuing within this State in the business of producing for sale, profit or commercial use any natural resource products, the amount of such tax to be equal to the value of the articles produced as shown by the gross proceeds derived from the sale thereof by the producer, except as otherwise provided, multiplied by the respective rates as follows: * * *; natural gas, in excess of the value of five thousand dollars, seven and eighty-five one-hundredths per cent; * * *. The measure of this tax is the value of the entire production in this State, regardless of the place of sale or the fact that the delivery may be made to points outside the State."

Prior to 1959 the plaintiff reported for taxation under Section 2a all deliveries of free gas made by it to its lessors but after the decision of the case of *Triad Oil Company* v. *Ferguson*, decided by the Circuit Court of Kanawha County on July 8, 1955 and in which case an application for review upon certificate was denied by this Court on September 26, 1955, the plaintiff omitted all free gas deliveries from its reports in determining its gas production for taxation. In the *Triad Oil Company* case the circuit court, in a memorandum opinion, held that the Legislature had failed to provide the means of measuring the tax upon the payment of oil royalty and that for that reason the lessee in an oil and gas lease was not liable under Section 2a for taxes on oil royalties paid in kind.

The plaintiff contends that the *Triad Oil Company* case applies to and relieves the free gas, produced and delivered prior to its measurement by meter by the lessee, from taxation under Section 2a; and that such free gas is also not subject to taxation for the reason that it is not owned by the lessee but instead is owned by the lessors and in consequence no sale of it is made by the

lessee. The circuit court, applying the principle of the *Triad Oil Company* case and finding that no sale had been made of the free gas delivered before its quantity was measured by meter, held that such free gas was not taxable under the provisions of Section 2a.

Though the plaintiff now concedes that the free gas delivered by it after its measurement by meter is taxable production of gas, there is no merit in the contention of the plaintiff that the unmeasured free gas is owned by the lessors instead of the lessee and that because no sale was made of such gas it is not taxable under the foregoing statutory provisions. It is well established by numerous decisions of this Court that when a lessee under an oil and gas lease produces gas from the well, the right to produce such gas becomes a vested right and when the gas is extracted the title to the gas vests in the lessee and the consideration or royalty paid for the privilege of search and production is rent for the leased premises. See *Shearer* v. *Allegheny Land and Mineral Company,* 152 W. Va. 616, 165 S. E.2d 369; *Shearer* v. *United Carbon Company,* 143 W. Va. 482, 103 S. E.2d 883; *Engel* v. *Eastern Oil Company,* 100 W. Va. 301, 130 S. E. 491; *Campbell* v. *Lynch,* 81 W. Va. 374, 94 S. E. 739, L. R. A. 1918B 1070; *South Penn Oil Company* v. *Snodgrass,* 71 W. Va. 438, 76 S. E. 961, 43 L. R. A., N. S. 848; *McGraw Oil Company* v. *Kennedy,* 65 W. Va. 595, 64 S. E. 1027, 28 L. R. A., N. S., 959; *Headley* v. *Hoopengarner,* 60 W. Va. 626, 55 S. E. 744; *Urpman* v. *Lowther Oil Company,* 53 W. Va. 501, 44 S. E. 433, 97 Am. St. Rep. 1027; *Parish Fork Oil Company* v. *Bridgewater Gas Company,* 51 W. Va. 583, 42 S. E. 655, 59 L. R. A. 566; *Steelsmith* v. *Gartlan,* 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107; *Crawford* v. *Ritchey,* 43 W. Va. 252, 27 S. E. 220. See also *McIntosh* v. *Vail,* 126 W. Va. 395, 28 S. E.2d 607, 151 A. L. R. 804; *Warren* v. *Boggs,* 83 W. Va. 89, 97 S. E. 589. This Court has also held that free gas for the lessor is part of the consideration of a lease for oil and gas purposes, *Kimble* v. *Wetzel Natural Gas Company,* 134 W. Va. 761, 61 S. E.2d 728; *Bassell* v.

*West Virginia Central Gas Company,* 86 W. Va. 198, 103 S. E. 116, 12 A. L. R. 1398; *Harbert* v. *Hope Natural Gas Company,* 76 W. Va. 207, 84 S. E. 770, L. R. A. 1915E 570; *South Penn Oil Company* v. *Edgell,* 48 W. Va. 348, 37 S. E. 596, 86 Am. St. Rep. 43; and that the covenant to furnish free gas runs with the land and may be enforced. *Kimble* v. *Wetzel Natural Gas Company,* 134 W. Va. 761, 61 S. E. 2d 728; *Ketchum* v. *Chartiers Oil Company,* 121 W. Va. 503, 5 S. E.2d 414; *Bassell* v. *West Virginia Central Gas Company,* 86 W. Va. 198, 103 S. E. 116, 12 A. L. R. 1398; *Harbert* v. *Hope Natural Gas Company,* 76 W. Va. 207, 84 S. E. 770, L. R. A. 1915E 570; *Hall* v. *Philadelphia Company,* 72 W. Va. 573, 78 S. E. 755. The question of the ownership of the gas when it is discovered and extracted, despite the argument of the plaintiff in support of the ownership by the lessor instead of the lessee of the un-metered and unmeasured free gas, is not important or controlling. Regardless of the ownership of such gas it is clear that all free gas involved in this proceeding is produced by the plaintiff as lessee in its various leases. It is the production of gas, not its ownership, which is subjected to taxation under Section 2a. The value of gas produced is its value when production ends which in this instance is at the well. *Soto, Tax Commissioner* v. *Hope Natural Gas Company,* 142 W. Va. 373, 95 S. E.2d 769; *Hope Natural Gas Company* v. *Hall,* 102 W. Va. 272, 135 S. E. 582; *Hope Natural Gas Co.* v. *Hall,* 274 U. S. 284, 47 S. Ct. 639, 71 L. Ed. 1049. Though there is no sale, in the ordinary sense, of the free gas furnished to the lessor, no sale of such gas is necessary to subject it to the tax. The plaintiff is a person engaging within this State in the business of producing natural gas for sale, profit or commercial use within the meaning of Section 2a and the measure of the tax mentioned in the section is the value of the entire production in this State regardless of the place of sale or the fact that the delivery may be made to points outside the State. It is evident that the value of the free gas at the well is the same as the value of all other gas produced at the well which is sold and

delivered to its consumers by the plaintiff; and, on the basis of that valuation all the free gas furnished by the plaintiff to its lessors is subject to the tax provided by Section 2a. The amount of the tax levied by the defendant on all the free gas is $7,295.08. That levy should have been sustained by the circuit court and its action in vacating and setting it aside constitutes reversible error. The plaintiff concedes on this appeal that 57% of such free gas, which represents the amount of the free gas delivered to its lessors after measurement, is subject to the tax in the amount of $4,158.19 but that the remaining 43% of the free gas so furnished before measurement by meter is not subject to the tax. This contention, as indicated, is devoid of merit and the defendant is entitled to recover not only the amount of $4,158.19 which the plaintiff concedes that it owes but also the total amount of the levy of $7,295.08, which includes the amount of $4,158.19, upon the value of all the free gas produced by the plaintiff. All free gas produced by the lessee and furnished by the lessee to the lessor, pursuant to a covenant in an oil and gas lease, whether the amount of such gas is measured by meter before its delivery or is otherwise determined, is taxable at the rate provided by Section 2a, Article 13, Chapter 11, Code, 1931, as amended, upon the basis of the value of such free gas at the well at which such gas is produced. See *Hope Natural Gas Company* v. *Hall*, 102 W. Va. 272, 135 S. E. 582; *Hope Natural Gas Company* v. *Hall*, 274 U. S. 284, 47 S. Ct. 639, 71 L. Ed. 1049.

Issues Nos. 4, 5 and 6 relate to gas produced in West Virginia which is purchased and sold at wholesale by the plaintiff to other wholesale customers and is resold and transported by them to some consumers inside and to some consumers outside this State. Some of this gas is sold to Atlantic Seabord Corporation, The Manufacturers Light and Heat Company, and Cumberland and Allegheny Gas Company and by those companies transported and sold for consumption both inside and outside this State.

Issue No. 4 deals with gas produced in West Virginia by other companies which is purchased by the plaintiff and transported by means of its pipelines into Kentucky and back into West Virginia where it is sold by the plaintiff at wholesale to other wholesale customers who, after temporary underground storage of the gas in this State, remove such gas from storage and (a) transport it by means of pipelines out of this State to points of consumption in other states, or (b) transport it by pipelines out of this State and then return it for sale and consumption in this State, or (c) transport such gas by means of pipelines to points of resale and ultimate public consumption in this State.

Issue No. 5 deals with gas produced in West Virginia by other companies which is purchased by the plaintiff and transported by its pipelines to the point of sale by wholesale in West Virginia to wholesale customers who, after temporary underground storage of the gas in West Virginia, subsequently remove it from such storage and dispose of it in the same manner as is indicated in Issue No. 4. As between Issues Nos. 4 and 5 the difference is that the gas involved in sales in Issue No. 4 is transported by means of the pipelines of the plaintiff into Kentucky before it is sold in West Virginia and the gas in Issue No. 5 is transported by the plaintiff and sold to its customers in West Virginia.

Issue No. 6 deals with gas produced in West Virginia by other companies, which is purchased by the plaintiff, is commingled with imported gas in the pipelines of the plaintiff, is sold at wholesale to wholesale customers and is subsequently sold and delivered by them to consumers in West Virginia. The traffic of the gas begins and ends in this State and is for the purpose of taxation treated as an intrastate journey.

The question presented by Issues Nos. 4, 5 and 6, with respect to wholesale sales by the plaintiff of gas produced in this State to other wholesale customers, is whether

the gross income of the plaintiff from such wholesale sales is taxable under the provisions of Section 2c, Article 13, Chapter 11, Code, 1931, as amended; or is exempt from taxation by virtue of the Commerce Clause, Article I, Section 8 of the Constitution of the United States as income derived from transactions in interstate commerce.

Section 2c, Article 13, Chapter 11, Code, 1931, as amended, to the extent here pertinent, provides that "Upon every person engaging or continuing within this State in the business of selling any tangible property whatsoever, real or personal, * * *, there is likewise hereby levied, and shall be collected, a tax equivalent to one half of one per cent of the gross income of the business, except that in the business of selling at wholesale the tax shall be equal to twenty-five one-hundredths of one per cent of the gross income of the business."

The plaintiff contends that the foregoing wholesale sales of West Virginia gas to wholesale customers and by them resold to consumers are transactions in interstate commerce and are not subject to the tax imposed by Section 2c. On the contrary the defendant asserts that all such sales are not sales in interstate commerce but are local transactions and are subject to the designated tax. The circuit court held that all such sales were local, and not interstate, transactions, and as such were taxable, and approved the levy in the aggregate of $3,209.84 which embraced all the sales involved in Issues Nos. 4, 5 and 6, and that amount was included in the judgment of $92,249.23.

It is clear that the transportation to Kentucky and then back to West Virginia of the West Virginia gas purchased by the plaintiff in West Virginia from other producers, before it is sold at wholesale to other wholesale customers, does not, for the purpose of taxation, constitute an interstate journey. The transportation of the gas began in West Virginia and after passing through Kentucky it ended in this State. Passage of the gas through Ken-

tucky between the West Virginia termini is, for all practical purposes, intrastate or domestic and not interstate or foreign in character. *Norfolk and Western Railway Company* v. *Field,* 143 W. Va. 219, 100 S. E.2d 796. In that case this Court held in point 7 of the syllabus that "Though traffic commonly referred to as loop traffic is technically interstate commerce, it may, in certain or particular circumstances, be taxed as business done within the State to which it bears a special relation." There the traffic originated and ended in this State but moved over approximately 5.48 miles of railroad in Virginia and 0.28 of a mile in Kentucky. In that case this Court, quoting from *People ex rel. Cornell Steamboat Company* v. *Sohmer,* 235 U. S. 549, 35 S. Ct. 162, 59 L. Ed. 355, used this language: "Transportation between ports of a State is not interstate commerce to the extent of being excluded from the taxing power of the State because a part of the journey is over the territory of another State;". See also *International Harvester Company* v. *Department of Treasury,* 322 U. S. 340, 64 S. Ct. 1019, 1030, 88 L. Ed. 1313; *Lone Star Gas Company* v. *Texas,* 304 U. S. 224, 58 S. Ct. 883, 82 L. Ed. 1304; *Lehigh Valley Railroad Company* v. *Pennsylvania,* 145 U. S. 192, 12 S. Ct. 806, 36 L. Ed. 672. The headnote to the *International Harvester Company* case contains this language: "An Indiana tax upon gross income, as applied to receipts from the following classes of sales by a foreign corporation authorized to do business in Indiana, was not precluded by the Commerce Clause or the Fourteenth Amendment: (1) sales by out-of-State branches to Indiana dealers and users, where delivery is taken at plants of the corporation in Indiana; (2) sales to out-of-State buyers who come to Indiana, take delivery there, and transport the goods to another State; (3) sales in Indiana to Indiana buyers, where the goods are shipped from out-of-State points to the buyer." With respect to sales made outside Indiana to dealers and users residing in Indiana to whom deliveries were made in Indiana the court said: "These sales, moreover, are sales of Indiana goods to Indiana purchasers. While the contracts were

made outside the State, the goods were neither just completing nor just starting an interstate journey. It could hardly be maintained that Indiana could not impose a sales tax or a use tax on these transactions." In the *Lehigh Valley Railroad Company* case the headnote states that "A state tax against a railroad corporation, incorporated under its laws, on account of transportation done by it from one point within the State to another point within it, but passing during the transportation without the State and through part of another State, is not a tax upon interstate commerce, and does not infringe the provisions of the Constitution of the United States." In the opinion the court said: "The tax under consideration here was determined in respect of receipts for the proportion of the transportation within the State, but the contention is that this could not be done because the transportation was an entire thing, and in its course passed through another State than that of the origin and destination of the particular freight and passengers. There was no breaking of bulk or transfer of passengers in New Jersey. The point of departure and the point of arrival were alike in Pennsylvania. The intercourse was between those points and not between any other points. Is such intercourse, consisting of continuous transportation between two points in the same State, made interstate because in its accomplishment some portion of another State may be traversed? Is the transmission of freight or messages between two places in the same State made interstate business by the deviation of the railroad or telegraph line on to the soil of another State?

"* * *.

"It should be remembered that the question does not arise as to the power of any other State than the State of termini, * * *, but it is simply whether, in the carriage of freight and passengers between two points in one State, the mere passage over the soil of another State renders that business foreign, which is domestic. We do not think such a view can be reasonably entertained, and

are of opinion that this taxation is not open to constitutional objection by reason of the particular way in which Philadelphia was reached from Mauch Chunk."

The action of the court in *Lehigh Valley Railroad Company* case in considering carriage of freight and passengers between two points in one State to be local rather than foreign business is criticized in the opinion in the later case of *Central Greyhound Lines, Inc.* v. *Mealey*, 334 U. S. 653, 68 S. Ct. 1260, 92 L. Ed. 1633, in this language: "To call commerce in fact interstate 'local commerce' because under a given set of circumstances, as in the *Lehigh Valley* case, a particular exertion of State power is not rendered invalid by the Commerce Clause is to indulge in a fiction." Notwithstanding this criticism, however, the Court, in the *Mealey* case agreed that the State tax under consideration in the *Lehigh Valley Railroad Company* case, as apportioned, even though it affected interstate commerce, was valid because it did "not burden interstate commerce in the constitutional sense."

For the same reason that the sale of gas transported from West Virginia into Kentucky and back into West Virginia, before its sale by the plaintiff, is considered to be a domestic or an intrastate transaction and not a foreign or an interstate transaction, the sale of gas transported by the wholesale customer from this State for consumption in other States or returned to this State, after completion of the wholesale sale of such gas by the plaintiff, is likewise a domestic or an intrastate transaction and not a foreign or an interstate transaction.

In support of the contention of the plaintiff that the wholesale sales involved in Issues Nos. 4, 5 and 6 constitute transactions in interstate commerce and for that reason are not subject to the tax imposed by Section 2c, the plaintiff cites and relies upon *Hope Natural Gas Company* v. *Hall,* 102 W. Va. 272, 135 S. E. 582; *Hope Natural Gas Company* v. *Hall,* 274 U. S. 284, 47 S. Ct. 639, 71 L. Ed. 1049; *Eureka Pipe Line Company* v. *Hallanan,* 257 U. S. 265, 42 S. Ct. 101, 66 L. Ed. 227; *United Fuel Gas*

*Company* v. *Hallanan,* 257 U. S. 277, 42 S. Ct. 105, 66 L. Ed. 234; *Michigan-Wisconsin Pipe Line Company* v. *Calvert,* 347 U. S. 157, 74 S. Ct. 396, 98 L. Ed. 583, and numerous other cases. Each of the cited cases is clearly distinguishable from the facts involved in Issues Nos. 4, 5 and 6 in this proceeding.

A State, by appropriate legislation, may impose a privilege tax upon a person engaged in both interstate and intrastate commerce if such tax is imposed solely upon its intrastate business and such business can be separated and distinguished from its interstate business. See *State ex rel. Battle* v. *The Baltimore and Ohio Railroad Company,* 149 W. Va. 810, 143 S. E.2d 331, certiorari denied, 384 U. S. 970, 86 S. Ct. 1859, 16 L. Ed. 2d 681; *American Barge Line Company* v. *Koontz,* 136 W. Va. 747, 68 S. E.2d 56; *Dravo Contracting Company* v. *James,* 114 F.2d 242; *Cooney* v. *Mountain States Telephone and Telegraph Company,* 294 U. S. 384, 55 S. Ct. 477, 79 L. Ed. 934; *East Ohio Gas Company* v. *Tax Commission of Ohio,* 283 U. S. 465, 51 S. Ct. 499, 75 L. Ed. 1171; *Sprout* v. *City of South Bend,* 277 U. S. 163, 48 S. Ct. 502, 72 L. Ed. 833, 62 A.L.R. 45; *Air-Way Electric Appliance Corporation* v. *Day,* 266 U. S. 71, 45 S. Ct. 12, 69 L. Ed. 169; *Allen* v. *Pullman's Palace Car Company,* 191 U. S. 171, 24 S. Ct. 39, 48 L. Ed. 134; *Ratterman* v. *Western Union Telegraph Company,* 127 U. S. 411, 8 S. Ct. 1127, 32 L. Ed. 229; *Bowman* v. *Continental Oil Company,* 256 U. S. 642, 41 S. Ct. 606, 65 L. Ed. 1139. As the amount of the gas produced in this State which is commingled with the imported gas, though not measured, can be determined with reasonable accuracy, the wholesale sale by the plaintiff of such gas to its wholesale customers is subject to the tax at the rate provided by Section 2c for wholesale sales of gas. In the *Hope Natural Gas Company* case it was held that, though no business and occupation tax could be imposed upon the gas produced in this State after it entered interstate commerce, the State may take into consideration the gross proceeds of a commodity produced in this State and sold in another

state but only for the purpose of determining the value of such commodity within the State and before it entered interstate commerce. In the *Eureka Pipeline Company* case the court held that the oil involved in that case became a part of a stream of oil passing through and out of the State and was interstate commerce, and that a tax on the transportation of such oil insofar as measured by the quantities produced in but moving out of West Virginia was void under the Commerce Clause; and in the *United Fuel Gas Company* case the court held that natural gas, collected and purchased by a pipeline company within a State and moving through its pipes and the pipes of other companies to which it sells, in continuous streams destined beyond the State, is a subject of interstate commerce, and that the transportation of such gas is not subject to tax by the State. As the wholesale sales of the gas involved in Issues Nos. 4, 5 and 6 were not subjects of interstate commerce, the three last cited cases are clearly inapplicable to and do not control the decision of those issues.

Whether the transportation by the plaintiff of West Virginia gas into Kentucky and back into West Virginia before it made a wholesale sale of the gas in West Virginia to a wholesale customer or the transportation by a wholesale customer of West Virginia gas outside West Virginia and then back into West Virginia after the wholesale sale of the gas by the plaintiff in West Virginia to such wholesale customer is considered to be a transaction in intrastate or interstate commerce is not controlling in the determination of the validity of the tax imposed on such wholesale sale for the reason that the transportation of the gas by the plaintiff of the West Virginia produced gas into Kentucky and back into West Virginia, had ended at the point of sale before the sale was made, and the sale of the gas purchased by the wholesale customer which it transported outside this State and then back into this State and resold for consumption in this State was completed before such gas was transported from

this State to any other state. It is, therefore, clear that none of such wholesale sales of the locally produced gas constituted a transaction in interstate commerce. Each of such sales, being a local transaction, is subject to the tax on wholesale sales imposed by Section 2c, Article 13, Chapter 11, Code, 1931, as amended. Wholesale sales in this State by a public utility to wholesale customers of gas produced in this State by other producers, after such gas has been transported by such utility to Kentucky and then returned to this State for transportation and sale by such wholesale customers to consumers within or without this State are not a subject of interstate commerce but instead are local or intrastate transactions and as such are taxable at the rate provided by Section 2c for wholesale sales of gas produced in this State; and wholesale sales in this State by such utility to wholesale customers of gas produced in this State by other producers before such gas has been transported by such wholesale customers from this State to any other state for sale to consumers in that state or for sale to consumers in this State are not a subject of interstate commerce but instead are local or intrastate transactions and as such are taxable at the rate provided by Section 2c for wholesale sales of gas produced in this State. With respect to such sales the transportation of the gas had ended or had not occurred at the time such sales were made.

The wholesale sales by the plaintiff, involved in Issue No. 6, of gas produced in West Virginia by other companies, to wholesale purchasers, which was commingled by them with imported gas and transported to a point in West Virginia where it is sold and delivered to West Virginia consumers, is a local and not an interstate transaction. Its transportation with the commingled imported gas began and ended in West Virginia and the amount of the gas sold at wholesale by the plaintiff and transported and delivered in West Virginia by the wholesale customer is subject to the wholesale tax imposed by

Section 2c. That the quantity of such gas can not be exactly determined by actual measurement does not of itself make the transportation of the gas with the commingled imported gas a transaction in interstate commerce. It is evident that the amount of such gas can be determined and computed with sufficient accuracy to subject the wholesale sale of such gas to the taxation imposed upon such sale by Section 2c as a local or intrastate transaction. Wholesale sales by a public utility in this State to wholesale customers of gas produced in this State, the quantity of which can be determined with reasonable accuracy, and which by such wholesale customers is commingled with imported gas and transported by their pipelines from one point to another point in this State for sale and consumption in this State are not sales in interstate commerce but instead are local or intrastate transactions and as such are taxable at the rate provided by Section 2c for the wholesale sale of such gas.

Issue No. 7 relates to sales by the plaintiff of gas to industrial consumers in this State under special contracts between the plaintiff and such industrial consumers. Fourteen such contracts with industrial customers are described in connection with Issue No. 7. The points of delivery under these contracts are all located in plaintiff's utility traffic service area and the gas delivered to special contract industrial consumers is metered and measured by regulation equipment of the plaintiff located on the premises of each industrial consumer. Eleven of these consumers are served by the pipelines in the distribution system of the plaintiff and three such special contract industrial consumers, E. I. du Pont de Nemours and Company, Elk Refining Company and Kaiser Aluminum and Chemical Corporation, are served by the transmission pipelines of the plaintiff. The gas furnished to these three consumers under special industrial contracts is dealt with specifically in Issue No. 10 and the gas furnished by the plaintiff to the eleven special contract industrial consumers is dealt with in Issue No. 7.

Issue No. 7 presents the question whether Section 2d, Article 13, Chapter 11, Code, 1931, as amended, in providing that the measure of the tax under that section shall include only gross income received from the supplying of public services and that the gross income of the taxpayer from any other activity shall be included in the measure of the tax imposed by the appropriate section or sections of that article, excludes from its measure the gross income of the plaintiff from the sales of gas delivered in its West Virginia utility service territory to industrial consumers under special industrial contracts, individually negotiated, as distinguished from the gross income of the plaintiff from sales of gas to industrial and all other consumers who are served under its official utility tariff approved by the Public Service Commission, for direct consumption or use in the purchaser's business activity in West Virginia either (a) as a source of energy or (b) as a raw material ingredient or component part of a product which the purchaser manufactures for sale, and thus renders such gross income taxable under Section 2c as wholesale sales, on the ground that such special contracts of industrial sales are not the supplying of public services under the manifest legislative intent of Section 2d. That section, to the extent here pertinent, provides that "Upon any person engaging or continuing within this State in any public service or utility business, * * *, there is likewise hereby levied and shall be collected taxes on account of the business engaged in equal to the gross income of the business multiplied by the respective rates as follows: * * *; natural gas companies, three and nine tenths per cent on the gross income, said gross income for this purpose to be determined by deducting from gross income from all sales of gas to consumers the amount of the tax paid by the taxpayer under section two-a [§ 11-13-2a] of this article on the production of the same gas; * * *. The measure of this tax shall not include gross income derived from commerce between this State and other states of the United States or between this State and foreign countries. The measure

of the tax under this section shall include only gross income received from the supplying of public services. The gross income of the taxpayer from any other activity shall be included in the measure of the tax imposed upon the appropriate section or sections of this article."

The plaintiff contends that special contracts are private, unregulated business, authorized by the Public Service Commission in an exercise of its reviewable discretion, and that such contracts are taxable only at the wholesale rate provided by Section 2c as nonutility sales of gas to manufacturers under tax regulation BOT-32 because they are not services under the official utility tariff and thus are not the supplying of public services within the meaning of Section 2d; that the supplying of public services includes only gross income from utility services under an official utility tariff; and that the gross income from special industrial contracts is taxable only under the wholesale rate of Section 2c as nonutility sales to manufacturers.

In opposition to the contentions of the plaintiff the defendant insists that the gas furnished industrial consumers under special industrial contracts is the supplying of public services as provided by Section 2d; that the sales of gas under such special industrial contracts are not nonutility sales; and that such sales are taxable at the rate provided by Section 2d for the supplying of public services and are not taxable at the wholesale rate provided by Section 2c.

The circuit court held that the gas sold and furnished to industrial consumers under the special contracts involved in Issue No. 7 constituted the supplying of public services within the meaning of Section 2d, Article 13, Chapter 11, Code, 1931, as amended, and that such public services were taxable at the rate provided by that section.

The plaintiff furnishes gas to numerous industrial consumers with which it does not have special contracts and the price for the gas which it sells to its nonspecial in-

dustrial contract consumers is the rates prescribed in the official utility tariff established under the regulations of the Public Service Commission of West Virginia. These rates are higher than the rates set forth in the special industrial contracts which are agreed to and established by the parties to such special industrial contracts. Under special industrial contracts the utility can sell and the consumers are enabled to obtain large supplies of gas at a cost which, because of the lower rates, such consumers would be unwilling or could not afford to purchase at the higher rates established by the official utility tariff but such rates are, at any time, subject to regulation by the Public Service Commission. The contract rates are not regulated or established by the Federal Power Commission or by the Public Service Commission. The consumers served under the special industrial contracts are located in the utility territory of the plaintiff embraced in the Certificate of Public Convenience and Necessity issued to the plaintiff by the Public Service Commission. The special industrial contracts here under consideration are filed with the Public Service Commission in accordance with Rule 39 of the Rules and Regulations promulgated by the commission. The gas furnished and sold to these special industrial consumers is delivered to their premises by the plaintiff and is metered by its measuring and regulating equipment located on the premises of such consumers and each of them uses and consumes the gas delivered to it under such contract in its business in the utility service territory of the plaintiff. The facilities used by the plaintiff in supplying gas to its special industrial contract consumers are a part of its integrated system by which it serves all of its consumers without distinction as to whether the consumer received gas under special industrial contracts or otherwise; and the plaintiff is a public utility within the meaning of Chapter 24, Code, 1931, as amended, and is subject to regulation by the Public Service Commission of this State.

Section 1, Article 1, Chapter 24, Code, provides that "Except where a different meaning clearly appears from the context, the words 'public utility' when used in this chapter shall mean and include any person or persons, or association of persons, however associated, whether incorporated or not, including municipalities, engaged in any business, whether herein enumerated or not, which is, or shall hereafter be held to be, a public service. * * *." Section 1, Article 2, Chapter 24, Code, 1931, as amended, provides that the jurisdiction of the commission shall extend to all public utilities in this State, and shall include any utility engaged, among other activities, in the transportation of oil, gas or water by pipeline, and in any other public service.

Though the Public Service Commission has not regulated the special industrial contracts here under consideration or the rates provided by such contracts which are fixed by agreement of the parties to such contracts, the commission has the power and authority to do so in its discretion, and the absence of such regulation does not deprive it of its power and authority to regulate, modify or terminate such contracts in circumstances which justify such action. In *Preston County Light and Power Company v. Renick*, 145 W. Va. 115, 113 S. E.2d 378, this Court held in point 2 of the syllabus that "The public service commission of this State has authority to supervise, regulate, modify or approve a contract between public utilities subject to its jurisdiction which affects the service rendered to the public or the rate charged for such service." In the opinion this Court said: "Though as a general rule public utilities have the right to enter into contracts between themselves or with others, free from the control or supervision of the state, so long as such contracts are not unconscionable or oppressive and do not impair the obligation of the utility to discharge its public duties, the principle is firmly established that all contracts made by a utility relating to the public service must be deemed to be entered into in contemplation of the exercise by the

state of its regulatory power whenever the public interest may make it necessary; and when such contracts are the subject of statutory regulation, no contract for service may be made by a public utility except as provided by law, although an otherwise valid contract is binding on the parties to it until a departure from such contract has been directed by competent authority." See also *Mountain State Water Company* v. *Town of Kingwood,* 121 W. Va. 66, 1 S. E.2d 395; *City of Charleston* v. *Public Service Commission,* 86 W. Va. 536, 103 S. E. 673; *Clarksburg Light and Heat Company* v. *Public Service Commission of West Virginia,* 84 W. Va. 638, 100 S. E. 551; *Mill Creek Coal and Coke Company* v. *Public Service Commission,* 84 W. Va. 662, 100 S. E. 557, 7 A. L. R. 1081; *City of Benwood* v. *Public Service Commission,* 75 W. Va. 127, 83 S. E. 295, L. R. A. 1915C, 261; *Wingrove* v. *Public Service Commission,* 74 W. Va. 190, 81 S. E. 734, L. R. A. 1918A, 210. In *Wilhite* v. *Public Service Commission of West Virginia,* 150 W. Va. 747, 149 S. E.2d 273, this Court said that the test as to whether a person, firm or corporation is a public utility is the dedication or holding out, either express or implied, that such person, firm or corporation is engaged in the business of supplying his or its product or services to the public as a class or any part of such public as distinguished from services to only particular individuals. It is clear that the plaintiff is a public utility and by engaging in the business of serving the public has dedicated its facilities to public service. The paramount duty of a public utility is to serve the public, including industrial consumers who demand its service within its public service territory. See *United Fuel Gas Company* v. *Public Service Commission,* 105 W. Va. 603, 144 S. E. 723; *United Fuel Gas Company* v. *Public Service Commission,* 95 W. Va. 415, 121 S. E. 281; *Kelly Axe Manufacturing Company* v. *United Fuel Gas Company,* 87 W. Va. 368, 105 S. E. 152; *Mill Creek Coal and Coke Company* v. *Public Service Commission,* 84 W. Va. 662, 100 S. E. 557, 7 A. L. R. 1081; *Clarksburg Light and Heat Company* v. *Public Service Commission of West Virginia,*

84 W. Va. 638, 100 S. E. 551. In the *Clarksburg Light and Heat Company* case this Court said "The duty of the petitioner to supply the public with gas is its paramount duty. It makes no difference who that public is, or to what use the gas is to be appropriated."

It is clear that the plaintiff, as a public utility, is engaged in the service of the public in furnishing gas to its consumers, individual and industrial, in its service territory and that in furnishing gas to its industrial consumers under special industrial contracts it is engaged in the business of supplying public service within the meaning of Section 2d, Article 13, Chapter 11, Code, 1931, as amended; that the gross income received from such public service is taxable at the rate provided by that section for such service; and that the business of supplying such service is not a nonutility sale taxable at the wholesale rate provided by Section 2c. Accordingly, the action of the circuit court in resolving Issue No. 7 adversely to the plaintiff is, in all respects, correct and proper.

Issue No. 8 presents the question whether the equal protection clause of the Fourteenth Amendment to the Constitution of the United States and Article X, Section 1 of the Constitution of West Virginia prohibit the application of the higher tax rate provided by Section 2d to the gross income of the plaintiff from its special industrial contract sales in its utility service territory in West Virginia while the much lower wholesale sales rate of the tax provided by Section 2c is applied to the gross income derived from the unregulated wholesale sales of gas by nonutility gas companies to industrial consumers.

The plaintiff contends that discrimination in the different rates provided by the foregoing two sections is unconstitutional in that nonutility suppliers of the same industrial consumers are taxed under Section 2c at the rate of twenty-five one-hundredths of one per cent of the gross income realized by them from wholesale sales of gas to industrial consumers in this State, whereas the

plaintiff is taxed at the rate of three and nine-tenths per cent upon the gross income which it receives for the gas which it supplies to its industrial consumers under special industrial contracts.

The tax provided by Section 2d is imposed only upon a person engaging or continuing within this State in any public service or utility business and the amount of the tax is computed on the gross income from such business. A nonutility supplier of gas by wholesale sales is not within but is excluded from the provision of Section 2d and is not subject to the tax imposed by that section. The plaintiff in supplying and furnishing gas at wholesale to its industrial consumers under special industrial contracts in its utility service territory is engaged in public service or utility business, and in making such sales it is supplying to its industrial consumers public service and is within the provisions of Section 2d as determined by this Court in its decision upon Issue No. 7. Nonutility suppliers of gas are in a different classification for tax purposes than that of the plaintiff as the supplier of public service and these different classifications are valid and are not violative of any provision of the Constitution of the United States or of the Constitution of West Virginia. Nonutility suppliers of gas are not subject to regulation by the Public Service Commission. They do not dedicate their facilities to and do not engage in public service within the meaning of the statutes relating to public utilities. *Wilhite* v. *Public Service Commission of West Virginia,* 150 W. Va. 747, 149 S. E.2d 273. In that case this Court held in point 2 of the syllabus that "The Public Service Commission of West Virginia has no jurisdiction and no power or authority except as conferred on it by statute and necessary implications therefrom, and its power is confined to the regulation of public utilities. It has no inherent power or authority."; in point 3 of the syllabus that "The test as to whether or not a person, firm or corporation is a public utility is that to be such there must be a dedication

or holding out either express or implied that such person, firm, or corporation is engaged in the business of supplying his or its product or services to the public as a class or any part thereof as distinguished from the serving of only particular individuals; and to apply this test the law looks at what is being done, not to what the utility or person says it is doing."; and in point 4 of the syllabus that "The mere fact that a product which is usually dispensed by or sold by a utility to the public is being furnished does not make every person, firm, or corporation selling such product a public utility. If such product is sold under private contract and the seller does not hold himself out to sell such product to the public or render some service to the public he is not a public utility."

The law confers certain privileges and imposes certain duties upon a public utility which are distinct from those conferred or imposed by law upon a nonutility. The paramount duty of a public utility is to serve all the public within its utility service territory; a nonutility is subject to no such duty. A public utility enjoys protection from competition within its field, is entitled to a fair return upon its investment used and useful in its public service business, and possesses the right of eminent domain. No such advantages are enjoyed by a nonutility. The differences in the rights and duties of a public utility and a nonutility justify the separate classification in which each is included. In *Arslain* v. *Alderson,* 126 W. Va. 880, 30 S. E.2d 533, this Court used this language: "Unless the power of the Legislature over a subject matter is negatived by the Constitution, the Legislature has plenary power. * * *. We know of no provision of the Constitution which requires that the same rate be applied to all classes of businesses and callings on which privilege taxes are assessed. The Legislature may prescribe rates for different businesses and callings, but the rate of taxation must be uniform and equal within the classification and, if so, we see no constitutional objection thereto." In *Appalachian Electric Power Company* v. *Koontz,* 138 W. Va. 84,

76 S. E.2d 863, this Court said that "taxes need be equal and uniform only as to the same class of business." This Court has also said in *Clarksburg Light and Heat Company* v. *Public Service Commission of West Virginia,* 84 W. Va. 638, 100 S. E. 551, that when a utility is engaged in supplying gas to the public "it cannot supply a part of that public under private contract, and a part of it under public regulation."

It is well established that a state by its legislature may make reasonable classifications in enacting statutes provided the classifications are based on some real and substantial relation to the objects sought to be accomplished by the legislation, and a person who assails any such classification has the burden of showing that it is essentially arbitrary and unreasonable. *State ex rel. Heck's, Inc.* v. *Gates,* 149 W. Va. 421, 141 S. E.2d 369. In that case this Court in the opinion used this pertinent language: "The necessity for and the reasonableness of a classification are primarily questions for the legislature and if any state of facts can be reasonably conceived to support the classification such state of facts at the time of the enactment of a statute must be assumed. The presumption is that the classification is reasonable and appropriate and that the act is constitutional unless illegality appears on its face. *Mandell* v. *Haddon,* 202 Va. 979, 121 S. E.2d 516. The Equal Protection Clause of the Fourteenth Amendment does not deprive the States of the authority to make a reasonable classification in enacting statutes under the police power, provided the classification is based on some real and substantial relation to the objects sought to be accomplished by the legislation, and a person who assails the classification has the burden of showing that it is essentially arbitrary and unreasonable. *Mandell* v. *Haddon,* 202 Va. 979, 121 S. E.2d 516; *Martin's Ex'rs.* v. *Commonwealth,* 126 Va. 603, 102 S. E. 77; *McGowan* v. *Maryland,* 366 U. S. 420, 81 S. Ct. 1101, 6 L. Ed. 2d 393; *Gallagher* v. *Crown Kosher Super Market of Massachusetts, Inc.,* 366 U. S. 617, 81 S. Ct. 1122, 6 L.

Ed. 2d 536; *Braunfeld* v. *Brown,* 366 U. S. 599, 81 S. Ct. 1144, 6 L. Ed. 2d 563; *Two Guys From Harrison-Allentown, Inc.* v. *McGinley,* 366 U. S. 582, 81 S. Ct. 1135, 6 L. Ed. 2d 551. The Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States does not preclude the resort to classification for the purpose of legislation if the classification is reasonable, is based on pertinent and real differences, and has as its object a purpose germane to the legislation. *Tweel* v. *West Virginia Racing Commission,* 138 W. Va. 531, 76 S. E.2d 874, appeal dismissed, 346 U. S. 869, 74 S. Ct. 123, 98 L. Ed. 379."

Wholesale sales of natural gas by a public utility to industrial consumers within its utility service territory under special industrial contracts constitute the supplying of public service within the meaning of Section 2d, Article 13, Chapter 11, Code, 1931, as amended, and the taxation of such sales at a higher rate than is imposed by Section 2c of the same article and chapter upon an unregulated nonutility which makes the same kind of wholesale sales to industrial consumers is not violative of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States or of Article X, Section 1 of the Constitution of West Virginia.

Issue No. 9 involves the effect of the tax commissioner's Regulation BOT-32 on the wholesale sales of gas by the plaintiff to its industrial consumers under special industrial contracts, dealt with in Issue No. 7, which sales this Court, in resolving Issue No. 7 has held to constitute the supplying of public services within the meaning of Section 2d, Article 13, Chapter 11, Code, 1931, as amended; and that issue is stated in this language: "Do the Equal Protection Clause of the 14th Amendment to the United States Constitution and Section 1, Article X of the West Virginia Constitution prohibit the higher rate of Tax Section 2d from being applied to United Fuel's gross income from such special contract industrial sales of gas made in its West Virginia service territory, in view of

the fact that Regulation BOT-32, one of the official Regulations promulgated to aid in the administration of the Business and Occupation Tax, properly recognizes that a gas utility company can make (i) 'non-utility sales' of produced gas taxable only under Tax Section 2a, and (ii) 'non-utility sales' of purchased gas taxable only under Tax Section 2c, under which said Regulation BOT-32 the Tax Commissioner admits any or all of United Fuel's special contract industrial sales would be 'non-utility sales' of gas if they were made in West Virginia but outside the company's utility service territory." The plaintiff asserts that the tax commissioner has interpreted Regulation BOT-32 so as to distinguish between special contract industrial sales within and without the utility service territory of the plaintiff and to classify such sales by a utility outside its utility service territory as nonutility sales; that there is nothing in law or logic which justifies such interpretation; and that such interpretation is violative of the equal protection clause of the Fourteenth Amendment of the Constitution of the United States and Section 1, Article X of the Constitution of West Virginia. The regulation in question provides that persons engaged in the business of selling gas as a utility are liable for the taxes levied under Section 2d of the statute and that utilities in the business of making nonutility sales of tangible property shall report the gross income of such sales under Item C-1, retail classification, or Item C-2, wholesale classification, depending on whether the sales are retail or wholesale. Though the regulation by implication recognizes and permits nonutility sales, nowhere does it expressly or by necessary implication provide that the sale of gas by a utility outside its utility service territory is a nonutility sale. As all of the wholesale sales of gas by the plaintiff to its industrial consumers under the special industrial contracts involved in Issue No. 7 were consummated in the utility service territory of the plaintiff and as none of such sales or any other sale involved in this proceeding

was made outside its utility service territory, the question of the ill effects of such sale outside such utility service territory as a result of the interpretation of the regulation by the tax commissioner, of which the plaintiff complains, is not an issue for determination in this case; and for that reason that question is not considered or decided on this appeal.

The circuit court, in considering Issue No. 9, decided that issue adversely to the plaintiff. The sales of gas by the plaintiff to its industrial consumers under the special industrial contracts involved in Issue No. 7 having been herein determined to be the supplying of public service by a utility and not to be nonutility sales, the action of the circuit court in deciding Issue No. 9 adversely to the contention of the plaintiff will not be disturbed on this appeal.

Issue No. 10 relates to three special industrial contracts for the sale and delivery of gas through the transmission pipelines of the plaintiff to E. I. du Pont de Nemours and Company at its plant at or near Belle in Kanawha County, to Elk Refining Company at its refinery at or near Falling Rock in Kanawha County, and to Kaiser Aluminum and Chemical Corporation at its plant near Ravenswood in Jackson County. Each of these contracts between the plaintiff and each company covers a long period of time and calls for the continuous delivery of large minimum supplies of gas. The issue presents the question whether the gas involved is transported in interstate commerce and whether the income derived from its sale is taxable or is excluded from taxation under Section 2d, Article 13, Chapter 11, Code, 1931, as amended.

The gas involved in this issue, which consists entirely or almost entirely of gas produced in Louisiana and Texas, referred to as southwestern gas, and in Kentucky and Virginia and obtained by the plaintiff from Tennessee Gas Transmission Company or from Columbia Gulf Transmission Company and transported by large transmission lines for sale and delivery by the plaintiff to its special

industrial consumers at the plant of each company, is transported in high pressure transmission lines directly in a continuous stream to such plants, except during the months of May through October when it is temporarily placed in underground storage and transported as needed in a continuous stream from such storage to such plants during the months of January through April and November and December. The flow and the delivery of the gas to the plant are continuous and without interruption whether the gas is furnished without passing through storage or is withdrawn from storage for delivery to the plants. The purpose and effect of such storage are to make available, at all times, the supply required by the industrial contract consumers.

The sales of gas to E. I. du Pont de Nemours and Company, sometimes referred to as du Pont, began late in 1956 after the execution of the special industrial sales agreement dated November 8, 1956 and after the Federal Power Commission issued a Certificate of Public Convenience and Necessity which authorized the plaintiff to build and operate facilities consisting, in part, of 17.7 miles of 12¾ inch pipeline, capable of delivering a maximum of 35,000 Mcf per day. Plaintiff's long term arrangements with Tennessee Gas Transmission Company and the gas acquisition program of that company with its southwestern lessors and independent producers were all based, in part, on plaintiff's contractual obligation to meet du Pont's gas requirements at its Belle, West Virginia, plant. The gas delivered to du Pont was 100% southwestern gas purchased by the plaintiff from Tennessee Gas Transmission Company in Kanawha County and then transported southerly by the plaintiff to the Kanawha County point of delivery to du Pont by the transmission lines of the plaintiff. In the summer period the gas flowed continuously from the various producing wells in Louisiana and Texas to du Pont's main line tap near the end of the transmission line in Belle without injection into or withdrawal from any underground storage field, and

the gas delivered to du Pont in the winter period was the same Louisiana and Texas gas which was stored during the summer periods in a storage field about five miles northeast of Belle. In the winter periods the gas was withdrawn from the storage field as required by du Pont. The gas is used in the manufacture of various products. After the gas is delivered it is converted into ammonia within a few minutes and the gas used in the manufacture of other products is converted into such products within a one day period. The contract between the plaintiff and du Pont required the plaintiff to sell and deliver and du Pont to purchase natural gas for processing purposes at its plant in an amount not to exceed, without the plaintiff's prior permission, 31,000 Mcf per day; provided a minimum bill for each billing month in the amount of $100,000.00 for gas delivered, except that from the beginning of the contract until April 30, 1959, the minimum monthly billing should be in the amount of 50% of the minimum of $100,000.00; provided that the aggregate purchase price for the gas produced in Texas, Louisiana and neighboring states should be the unit cost of southwestern gas subject to certain adjustments; fixed the term of the contract at twenty years, subject to termination by du Pont after the end of the first ten year period; stated that the greater part of plaintiff's gas supply originates in the southwest; fixed the delivery point of the gas at the outlet side of the plaintiff's metering and regulating installation located at the plant; and required delivery of the gas at a pressure of 550 pounds.

The sales of gas to Elk Refining Company, sometimes referred to as Elk, began as early as 1938 and before the enactment of the National Gas Act, but the operation by the plaintiff of the necessary facilities has been under a certificate from the Federal Power Commission for all preexisting jurisdictional facilities. The present contract between the plaintiff and Elk was entered into on September 1, 1957. The normal flow of the gas to Elk for the summer period of 1961 was 117,168 Mcf and consisted

of 100% West Virginia produced gas but the winter period deliveries to Elk consisted of 187,106 Mcf, 87% of which was southwestern gas from storage, 3% Kentucky gas from storage and 10% West Virginia gas. For the years 1957 and 1958 all the storage gas furnished Elk was 100% southwestern gas. For the summer periods and for the winter periods the deliveries are estimated to have been 92% southwestern gas withdrawn from underground storage and 8% West Virginia pipeline gas. By the contract with Elk the plaintiff agreed to sell and deliver and Elk agreed to purchase and receive natural gas for use in its refinery at or near Falling Rock, West Virginia, in quantities up to 2500 Mcf of gas per day. The contract provided a minimum charge of $1500.00 per month for each billing month for gas delivered; provided that the aggregate purchase price for the gas produced in Texas and Louisiana and neighboring states should be the unit cost of southwestern gas subject to certain adjustments; fixed the term of the contract at one year from September 1957 and thereafter from year to year until terminated by written notice by either party; stated that the greater part of plaintiff's gas supply originated in the southwest; fixed the delivery point of the gas at the outlet side of the plaintiff's measuring station located on the premises of Elk at Falling Rock, West Virginia; and required deliveries of the gas at pressures prevailing from time to time in the lines from which the deliveries are made.

The sales of gas to Kaiser Aluminum and Chemical Corporation, sometimes referred to as Kaiser, began after the execution of the special industrial sales agreement dated October 1, 1957 and after the Federal Power Commission issued a Certificate of Public Convenience and Necessity which authorized the plaintiff to build and operate facilities, consisting, in part, of six miles of 10 inch transmission pipeline capable of delivering a maximum of 5500 Mcf per day which maximum, by subsequent contract dated October 1, 1957, was increased to 13,000 Mcf per day and was authorized by the Federal Power

Commission. Plaintiff's long time southwestern gas supply contract was based, in part, on its obligation to furnish gas to Kaiser. Before and through the year 1958 all the gas delivered to Kaiser was 100% southwestern gas received by the plaintiff from Columbia Gulf Transmission Company in Boyd County, Kentucky, or purchased from Tennessee Gas Transmission Company at delivery points in Wayne County, West Virginia, and then transported by transmission lines of the plaintiff easterly and northerly to the point of delivery to Kaiser in Jackson County, West Virginia. In the summer periods the gas flows continuously from the various producing southwest wells to Kaiser at the main line tap about five miles southwest of Ravenswood, without injection into or withdrawal from any underground storage fields, and the gas delivered in the winter periods was stored for the summer periods from the same southwestern supply in an underground field about ten miles northeast of Ravenswood. In the winter periods the gas was withdrawn from the storage field as required by Kaiser. Since the year 1958 the gas sold to Kaiser consisted wholly or almost wholly of southwestern gas, and deliveries were made in the same manner as the gas deliveries prior to and during that year. The special industrial contract between the plaintiff and Kaiser required the plaintiff to sell and deliver and Kaiser to purchase natural gas for processing purposes at its plant at Ravenswood, West Virginia, in an amount not to exceed 13,000 Mcf per day; provided a minimum bill for each billing month in the amount of $15,000.00 until January 1, 1958, $20,000.00 until October 1, 1958, and $40,000.00 after October 1, 1958; provided that the aggregate purchase price for the gas produced in Texas, Louisiana and neighboring states should be the unit cost of southwestern gas subject to certain adjustments; fixed the term of the contract at twelve years and thereafter from year to year, subject to termination by either party after written notice, with the right in Kaiser to terminate the agreement at the end of the first three year period or at any time thereafter upon written notice to the

plaintiff and the payment to it of the sum of $170,000.00, representing the portion of the cost of the plaintiff of the construction of the 10 inch line extension to the Ravenswood plant, subject to certain credits; stated that the greater part of plaintiff's gas supply originated in the southwest; fixed the delivery point of the gas at the outlet side of the plaintiff's measuring station located on the premises of Kaiser; and required delivery of the gas at such pressures as would reasonably be required by Kaiser.

The defendant contends that the sales under these special industrial contracts were not transactions in interstate commerce but he also states in his brief that even though such transactions should be "technically considered to be interstate commerce," they were not so connected with interstate commerce that taxation under Section 2d would impose an unconstitutional burden on such commerce; and that even assuming that such sales were transactions in interstate commerce they were taxable under Section 2d because the tax did not constitute an unreasonable burden on interstate commerce. On the contrary the plaintiff insists that the sales under the three special industrial contracts were sales in interstate commerce and that, as such, they were excluded by the provisions of Section 2d from the tax provided by that section.

The circuit court found that the sales under the three special industrial contracts with du Pont, Elk and Kaiser were sales in interstate commerce; that Section 2d of the statute must be literally applied to exclude from the computation of the taxes not only sales in interstate commerce which would, if taxed, constitute an unreasonable burden on such commerce under the Constitution, but also to exclude all gross income from any transactions in interstate commerce; and, by so holding, ruled in favor of the plaintiff on Issue No. 10.

The finding of the trial court upon the undisputed facts that the sales of the imported gas to du Pont, Elk and Kaiser, under the special contracts, is entitled to

weight in the consideration of that issue. "The finding of a trial court upon facts submitted to it in lieu of a jury will be given the same weight as the verdict of a jury and will not be disturbed by an appellate court unless the evidence plainly and decidedly preponderates against such finding." Point 6, syllabus, *Daugherty* v. *Ellis,* 142 W. Va. 340, 97 S. E.2d 33. See also *The State Road Commission of West Virginia* v. *Oakes,* 150 W. Va. 709, 149 S. E.2d 293, and the many cases cited in the opinion in that case.

The conclusion of the writer of this opinion is to affirm the judgment of the circuit court on Issue No. 10 and it is supported by the immediately following reasons and citations of authority. That conclusion, however, is not concurred in by the majority of this Court whose ruling is to reverse on that issue and the opposite conclusion of the majority is set forth in the later paragraph of this opinion in which Issue No. 10 is dealt with and determined.

It is well established by numerous decisions of the Supreme Court of the United States that transportation of natural gas from one state to another for sale and consumption in the state where the transportation ends is interstate commerce. *The Pipe Line Cases,* 234 U. S. 548, 34 S. Ct. 956, 58 L. Ed. 1459; *Pennsylvania Gas Company* v. *Public Service Commission,* 252 U. S. 23, 40 S. Ct. 279, 64 L. Ed. 434; *United Fuel Gas Company* v. *Hallanan,* 257 U. S. 277, 42 S. Ct. 105, 66 L. Ed. 234; *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 43 S. Ct. 658, 67 L. Ed. 1117, 32 A.L.R. 300; *Missouri ex rel. Barrett* v. *Kansas Natural Gas Company,* 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027; *East Ohio Gas Company* v. *Tax Commission of Ohio,* 283 U. S. 465, 51 S. Ct. 499, 75 L. Ed. 1171; *State Tax Commission of Mississippi* v. *Interstate Natural Gas Company, Inc.,* 284 U. S. 41, 52 S. Ct. 62, 76 L. Ed. 156; *Illinois Natural Gas Company* v. *Central Illinois Public Service Company,* 314 U. S. 498, 62 S. Ct. 384, 86 L. Ed. 371; *Panhandle Eastern Pipe Line Company* v. *Public Service Commission*

*of Indiana,* 332 U. S. 507, 68 S. Ct. 190, 92 L. Ed. 128; *Memphis Natural Gas Company* v. *Stone,* 335 U. S. 80, 68 S. Ct. 1475, 92 L. Ed. 1832; *Panhandle Eastern Pipe Line Company* v. *Michigan Public Service Commission,* 341 U. S. 329, 71 S. Ct. 777, 95 L. Ed. 993. In the first cited *Panhandle Eastern Pipe Line Company* case the court, considering the scope of the Natural Gas Act of Congress, held that it did not prevent the state from regulating certain interstate sales of gas which were not covered by the Act but also held that the sales involved in that case of imported natural gas by an interstate pipeline carrier direct to industrial consumers were sales in interstate commerce. In the other cited *Panhandle Eastern Pipe Line Company* case, the gas company, which was engaged in the transportation of natural gas by pipeline from other states into Michigan and which was subject to regulation by the Federal Power Commission under the Natural Gas Act, sought to make direct sales of natural gas to large industrial consumers in Michigan. An order of the Michigan Public Service Commission required appellant to obtain from that commission a Certificate of Public Convenience and Necessity before selling natural gas direct to its industrial consumers in the Detroit area. In a proceeding to enjoin the enforcement of the order of the commission, the Supreme Court of the United States held that the direct sale to industrial consumers by the gas company of gas transported by it from other states into Michigan was clearly interstate commerce and that as the Natural Gas Act applied only to sales of gas in interstate commerce that were for resale and did not apply to interstate sales made direct to consumers the Natural Gas Act left such direct sales to state regulation. The decision in these two *Panhandle Eastern Pipe Line Company* cases establishes the proposition that the direct sales of gas imported from another state to industrial consumers is interstate commerce, and the recognition of the regulatory power of a state over such sale, because they are not covered by the Natural Gas

Act, is not material to the issue here involved for the reason that if such sales are interstate commerce they are within the scope of the exclusionary provision of Section 2d with respect to taxation of such sales.

In *Panhandle Eastern Pipe Line Company* v. *Public Service Commission of Indiana*, 332 U. S. 507, 68 S. Ct. 190, 92 L. Ed. 128, the plaintiff transported natural gas from Texas and Kansas fields into and across intervening states, including Indiana, to Ohio and Michigan. In Indiana Panhandle sold large amounts of its imported gas direct to large industrial consumers, one of which was Anchor-Hocking Glass Company and another was du Pont in that state. It intended to transport and deliver such imported gas directly to such large industrial consumers. Headnote 1 to that case states that "Sales of imported natural gas by an interstate pipeline carrier direct to industrial consumers are sales in interstate commerce, even though the gas leaves the main transmission line within the state and is piped to the consumers through branch lines or laterals at reduced pressure." In the opinion, with reference to such sales to industrial consumers, the court said "Nor do we question that these sales are interstate transactions." The court also used this language "Neither practical common sense nor constitutional sense would tolerate holding that reduction in pressure makes the industrial sales to Anchor-Hocking wholly intrastate for purposes of local regulation while deliveries at similar pressures to utility companies remain exclusively interstate. Variations in main pressures are not the criterion of the states' regulatory powers under the commerce clause. Cf. *Interstate Gas Co.* v. *Power Comm'n.*, 331 U. S. 680, 689. The sales here were clearly in interstate commerce."

In *East Ohio Gas Company* v. *Tax Commission of Ohio*, 283 U. S. 465, 51 S. Ct. 499, 75 L. Ed. 1171, the court held that the transportation of natural gas from wells outside of a state by the pipelines of producing companies to the state line, and thence, by means of the distributing com-

pany's high pressure transmission lines to their connections with its local systems is essentially national in character and is interstate commerce within and without the state; and that transfer of the title to or the custody of the gas while it is en route from state to state is not determinative of the question where interstate commerce ends. In the opinion the court used this pertinent language:

"It is elementary that a State can neither lay a tax on the act of engaging in interstate commerce nor on gross receipts therefrom. *Pullman Co.* v. *Richardson,* 261 U. S. 330, 338. *New Jersey Tel. Co.* v. *Tax Board,* 280 U. S. 338, 346. And, while a State may require payment of an occupation tax by one engaged in both intrastate and interstate commerce, the exaction in order to be valid must be imposed solely on account of the intrastate business without enhancement because of the interstate business done, and it must appear that one engaged exclusively in interstate business would not be subject to the imposition and that the taxpayer could discontinue the intrastate business without withdrawing also from the interstate business. *Sprout* v. *South Bend,* 277 U. S. 163, 170-171, and cases cited.

"The transportation of gas from wells outside Ohio by the lines of the producing companies to the state line and thence by means of appellant's high pressure transmission lines to their connection with its local systems is essentially national—not local—in character and is interstate commerce within as well as without that State. The mere fact that the title or the custody of the gas passes while it is en route from State to State is not determinative of the question where interstate commerce ends. *Public Utilities Comm.* v. *Landon,* 249 U. S. 239, 245. *Missouri* v. *Kansas Gas Co.,* 265 U. S. 298, 307-309. *Peoples Gas Co.* v. *Pub. Serv. Comm.,* 270 U. S. 550, 554. *Pub. Util. Comm.* v. *Attleboro Co.,* 273 U. S. 83, 89."

In *Illinois Natural Gas Company* v. *Central Illinois Public Service Company,* 314 U. S. 498, 62 S. Ct. 384, 86

L. Ed. 371, the court said: "That appellant and Panhandle Eastern are engaged in interstate commerce in the purchase and sale of the natural gas which moves in a continuous stream from points without the state into appellant's pipes within the state seems not to be open to question. *Missouri* v. *Kansas Gas Co.*, 265 U. S. 298; *Ozark Pipe Line Corp.* v. *Monier*, 266 U. S. 555; *Peoples Gas Co.* v. *Public Service Commission*, 270 U. S. 550; *State Tax Commission* v. *Interstate Gas Co.*, 284 U. S. 41. Pursuant to the mutual agreement of the two companies, the gas is transported in continuous movement through the pipe line into the state and through the appellant's pipes to the service lines of the distributors, where appellant delivers it to them. In such a transaction the particular point at which the title and custody of the gas pass to the purchaser, without arresting its movement to the intended destination, does not affect the essential interstate nature of the business. See *Peoples Gas Co.* v. *Public Service Commission, supra,* 554; *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 587; *United Fuel Gas Co.* v. *Hallanan,* 257 U. S. 277, 280-281."

Whether the title to or the custody of the imported gas sold by the plaintiff to its industrial consumers, du Pont, Elk and Kaiser, passed to the plaintiff when it entered its pipeline or to its industrial purchasers from the plaintiff, at or before, or after its delivery to them at their plants, is immaterial and did not in any wise affect, alter or terminate the interstate transportation of the gas in a continuous stream from points outside this State to the place of delivery within this State. See *The Pipe Line Cases*, 234 U. S. 548, 34 S. Ct. 956, 58 L. Ed. 1459; *East Ohio Gas Company* v. *Tax Commission of Ohio*, 283 U. S. 465, 51 S. Ct. 499, 75 L. Ed. 1171; *Illinois Natural Gas Company* v. *Central Illinois Public Service Company*, 314 U. S. 498, 62 S. Ct. 384, 86 L. Ed. 371.

Here there was no intrastate transportation after the interstate journey ended at the plants of du Pont, Elk and Kaiser where the gas was used or consumed. In this

respect the transportation of the gas which ended at those plants differed from the transportation of the product involved in the case of *Gambino* v. *Jackson*, 150 W. Va. 305, 145 S. E.2d 124, and in some cases cited by the defendant, in that in those cases there was intrastate transportation of the gas or other product to the consumer after the interstate journey had ended. Of course, in that situation the new local transportation was an intrastate transaction and as such was subject to taxation by the State. Here the transportation of the gas was intended to end, and it did, at each plant which was the journey's end.

In the *Gambino* case one of the questions involved was whether railroad shipment of a car of agricultural lime from Basic Lime Company, a lime sales company located near Cleveland, Ohio, to the railroad station at Pennsboro, in Ritchie County, West Virginia, for the defendant, the purchaser, and the transportation of portions of the lime by the defendant by truck from the railroad station to various local farmers who had ordered lime from the defendant, was an interstate journey from the point of origin in Ohio to the point of delivery to the various purchasers of the lime from the defendant, or whether the interstate character of the transportation ended at the railroad station. On that question this Court held that the interstate transportation began in Ohio and ended at the railroad station, which was the point at which the parties intended that the movement of the carload of lime consigned to the defendant should finally end and that the delivery by truck by the defendant from the railroad station to the purchasers of the lime from him was intrastate commerce. In point 2 of the syllabus this Court said that interstate commerce continues as such until the goods shipped therein reach the point where the parties originally intended that the movement should finally end and that the further local movement by the consignee of the goods in furtherance of a valid business conducted by him constitutes intrastate commerce. The

opinion in the *Gambino* case contends these pertinent statements:

"Here there was no intent that the lime was to be transported from Basic Lime Company to the ultimate consumer. As heretofore noted, Basic Lime had no knowledge of whom the ultimate consumer would be. The final destination of the lime from Basic Lime Company was the depot at Pennsboro, where it was consigned to Jackson. That being so, there was no stoppage from its origin to its intended destination.

"* * *. 'In order for local transportation of goods to constitute interstate or foreign commerce, there must be such continuity of movement as to show that shipment to the ultimate destination was within the original contemplation of the shipper and that stoppage or change of carriers is merely incidental to the shipment. Mere uninterrupted movement of goods will not necessarily constitute the local transportation a part of an interstate or foreign shipment; in order to make the local carriage interstate or foreign commerce, it must be shown that the shipper, when he made the original shipment, intended or had within his contemplation transportation to a point outside the state if the local transportation preceded the interstate or foreign traffic or, if it succeeded it, to the final local destination.'

"Further demonstrating this point is the following language: 'Interstate commerce ordinarily continues as such until it reaches the point where the parties originally intended that the movement should finally end.' 15 Am. Jur. 2d, Commerce, § 59. See also *Binderup* v. *Pathe Exchange,* 263 U. S. 291, 68 L. Ed. 308, 44 S. Ct. 96; *Southern Pac. Co.* v. *State of Arizona,* 249 U. S. 472, 63 L. Ed. 713, 30 S. Ct. 313; *Western Union Telegraph Company, et al.* v. *Foster,* 247 U. S. 105, 62 L. Ed. 1006, 38 S. Ct. 438, 1 A.L.R. 1278; *Pittsburgh and Southern Coal Company* v. *Bates,* 156 U. S. 577, 39 L. Ed. 538, 15 S. Ct. 415; *Danciger* v. *Cooley,* 248 U. S. 319, 63 L. Ed. 266, 39 S. Ct. 119; *Rosen-*

*berger* v. *Pacific Express Company,* 241 U. S. 48, 60 L. Ed. 880, 36 S. Ct. 510; and *United States* v. *Freeman,* 239 U. S. 117, 60 L. Ed. 172, 36 S. Ct. 32."

In this proceeding it is clear that transportation of the southwestern gas from points in Louisiana and Texas continued in unbroken flow into Kentucky or West Virginia in the transmission lines of the plaintiff direct to its intended destination at the plants of du Pont, Elk and Kaiser where it was delivered and consumed by those industrial consumers, except for temporary storage of portions of the gas which, as previously indicated, did not alter or terminate the direct transportation of the gas to its intended final destination. This continuous journey of the gas, from its points of origin outside this State to its intended final destination at the plants of du Pont, Elk and Kaiser in this State in substance duplicates the interstate transportation of the carload of lime in the *Gambino* case to its intended final destination at the railroad station at Pennsboro and, like the shipment in the *Gambino* case, the foregoing transportation of the gas constituted interstate commerce.

It is reasonably clear from the record, and it is not disputed, that the plaintiff purchased the southwestern gas for the express purpose of furnishing it to du Pont, Elk and Kaiser, and that it was the intention of the plaintiff and du Pont, Elk and Kaiser, the industrial purchasers, that the gas should be transported direct, as it was, from points outside West Virginia to the plants of du Pont, Elk and Kaiser in this State. The transportation of the gas in each instance, which originated outside this State, was intended by the plaintiff and the seller to it of such gas to continue in uninterrupted movement to each of the special industrial contract consumers at its plant and such gas was, in fact, transported in a continuous stream to its intended destination.

The temporary storage of that portion of the gas that passed through underground fields on its way to the

plants did not terminate or change its interstate journey. The temporary storage of the gas in an underground field for withdrawal and transportation to its intended destination resembles the temporary layover of a Pullman car or freight car in a railroad yard or station for transfer to another carrier to complete the intended interstate journey and such temporary delay or slight deviation does not change the character of the interstate transportation. Certainly it could not be successfully contended that a Pullman passenger car from Charleston to New York is not engaged in an interstate journey after the Pullman car is disconnected from the Chesapeake and Ohio train in the Washington terminal and after a temporary delay is connected to a Pennsylvania railroad train and by it is transported to the intended destination at the railroad station in New York.

In *Standard Oil Company* v. *Federal Trade Commission*, 340 U. S. 231, 71 S. Ct. 240, 95 L. Ed. 239, the petitioner obtained gasoline from fields in Kansas, Oklahoma, Texas and Wyoming, refined it in Indiana, and distributed it in fourteen middle western states. The gasoline sold by it in the Detroit area was transported by carrier tankers on the Great Lakes from Indiana to petitioner's marine terminal at River Rouge, Michigan. Enough of the gasoline was accumulated there during each navigation season to make a winter supply available from the terminal. The gasoline remained there or in nearby bulk storage stations for varying periods. While there the gasoline was owned by the petitioner and was en route from its refinery in Indiana to its market in Michigan. Although the gasoline was not brought to River Rouge pursuant to orders already taken, the demands of the Michigan territory were fairly constant, and the demands of petitioner's customers could be estimated accurately. The gasoline sold to customers in Detroit was taken from the gasoline stored at the terminal. The Supreme Court of the United States held that sales of such gasoline were interstate commerce and that they were not deprived of their inter-

state character by the temporary storage of the gasoline in the Detroit area.

In *Railroad Commission of Ohio* v. *Worthington,* 225 U. S. 101, 32 S. Ct. 653, 56 L. Ed. 1004, lake-cargo coal, destined for delivery to points in the northwest, was transported by railroad from the No. 8 Coal Field in eastern Ohio to the lake ports of Huron and Cleveland, Ohio, on Lake Erie for carriage from those points to the northwest by lake vessels. At those lake ports were dock facilities and machinery and appliances for unloading coal into vessels during the season of navigation. The operator of the dock facilities notified the railroad company that at a certain time a vessel would be at the port to load a given number of tons of coal. The railroad then picked up such cars of coal as were necessary to fill the cargo, moved them on the dock beside the vessel, and loaded the vessel with the coal and furnished the shipper with a cargo statement showing the car number and weight, and the total number of tons of coal in the vessel. The court held that such transportation of the coal was interstate commerce. See *Stafford* v. *Wallace,* 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; *Walling* v. *Jacksonville Paper Company,* 317 U. S. 564, 63 S. Ct. 332, 87 L. Ed. 460; *Wilcox* v. *Illinois Commerce Commission,* 23 Ill. 2d 432, 178 N. E.2d 873, 42 P. U. R. 3d 231; *West Virginia Pipe Line Company* v. *State,* 95 W. Va. 285, 120 S. E. 759.

In the *West Virginia Pipe Line Company* case this Court held in point 1 of the syllabus that "Oil purchased at producers' stock tanks in this state by a pipe line company, and in transit through its pipe line system to purchasers in another state, is in interstate commerce and therefore not legally subject to personal property tax in this state."; and in point 2 of the syllabus that "This is true, though as incidental to such commerce, quantities of the oil accumulated temporarily in collecting tanks which are part of the pipe line system." In the opinion this Court, in discussing the status of oil tem-

porarily stored in the stock tanks of the producer to be pumped out of this state in its pipe line system, used this language: "The tanks serve only to aid in that transportation, and while the oil at times accumulates, such accumulations are but temporary and incidental. It is not unlike the congestion of logs in a stream in transit to another state, when impeded by flood conditions. The logs are in interstate commerce and are not subject to tax in the state where they are temporarily held. *Champlain Realty Company* v. *Brattleboro,* 260 U. S. 366, 67 Law. Ed. 309, 25 A.L.R. 1195. * * *. If the oil is in interstate commerce at all, its temporary storage in the tanks is not material. * * *."

Though the defendant makes formal denial that the transportation of the imported southwestern gas to du Pont, Elk and Kaiser is in interstate commerce, he seeks to sustain the levy of the tax upon the gross income from the sale of such gas on the ground that the transportation of such gas, even if interstate commerce, is subject to the tax imposed because the tax does not constitute an unreasonable burden on interstate commerce. Numerous cases cited and relied on by the defendant sustain a tax on interstate commerce if such tax does not operate as a burden on interstate commerce but is merely an incident to such commerce. See *General Motors Corporation* v. *Washington,* 377 U. S. 436, 84 S. Ct. 1564, 12 L. Ed. 2d 430, rehearing denied, 379 U. S. 875, 85 S. Ct. 14, 13 L. Ed. 2d 79; *Panhandle Eastern Pipe Line Company* v. *Public Service Commission of Indiana,* 332 U. S. 507, 68 S. Ct. 190, 92 L. Ed. 128; *McGoldrick* v. *Berwind-White Coal Mining Company,* 309 U. S. 33, 60 S. Ct. 388, 84 L. Ed. 565, 128 A.L.R. 876; *Southern Natural Gas Corporation* v. *Alabama,* 301 U. S. 148, 57 S. Ct. 696, 81 L. Ed. 970; *Wiloil Corporation* v. *Pennsylvania,* 294 U. S. 169, 55 S. Ct. 358, 79 L. Ed. 838. In some of the cases cited and relied on by the defendant it was held that the transportation of gas from one state to another, as in the case at bar, was interstate commerce which could not be subjected to a

state tax, but that when the gas was placed in the local distribution system and then sold at retail locally, the interstate journey had ended and that such sales were local or intrastate transactions which were taxable by the State. See *Central Greyhound Lines, Inc.* v. *Mealey,* 334 U. S. 653, 68 S. Ct. 1260, 92 L. Ed. 1633; *Southern Natural Gas Corporation* v. *Alabama,* 301 U. S. 148, 57 S. Ct. 696, 81 L. Ed. 970; *Public Utilities Commission for the State of Kansas* v. *Landon,* 249 U. S. 236, 39 S. Ct. 268, 63 L. Ed. 577. These cases are clearly distinguishable from the case at bar as the imported southwestern gas sold to du Pont, Elk and Kaiser was delivered direct to the consumer at the end of the continuous interstate journey and was never placed in the local distribution system of the plaintiff. The argument based on the proposition that in such circumstances interstate commerce may be subjected to a valid state privilege tax is not pertinent to Issue No. 10. The question presented by that issue and here under consideration is not the validity of a state tax on interstate commerce in the absence of an exclusionary state statute which exempts such commerce from taxation but the validity of a tax on interstate commerce under a taxing statute of this State which provides that the measure of the tax shall not include gross income derived from commerce between this State and other states of the United States or between this State and foreign countries. To say that the tax in question is valid because it does not burden but is merely incidental to interstate commerce is to ignore and not determine the question presented by Issue No. 10 which, of course, is whether, if the transportation under the cited cases is taxable interstate commerce, the income derived from such commerce is exempt from taxation by the exclusionary provision of Section 2d of the statute of this State. That exclusionary statutory provision is plain and free from ambiguity. Its meaning is clear and unmistakable and shows clearly that the Legislature, in enacting it, intended that no tax under the statute should

be imposed on the gross income derived from interstate commerce. When a statute is clear and unambiguous and the legislative intent is plain the statute should not be interpreted by the court, and in such case it is the duty of the court not to construe but to apply the statute. *State ex rel. Riffle* v. *City of Clarksburg,* 152 W. Va. 317, 162 S. E.2d 181; *In re: Estate of Resseger* v. *Battle,* 152 W. Va. 216, 161 S. E.2d 257; *J. D. Moore, Inc.* v. *Hardesty,* 147 W. Va. 611, 129 S. E.2d 722, and the numerous cases cited in the opinion in that case. As the transportation of the imported southwestern gas and its sale and delivery are transactions in interstate commerce and the income derived from interstate commerce is expressly excluded from taxation under Section 2d, Article 13, Chapter 11, Code, 1931, as amended, the action of the circuit court in reversing and annulling the tax levied on the sales of the imported southwestern gas transported and delivered to du Pont, Elk and Kaiser is, in my opinion, correct and proper. Of course, the gas produced and transported within this State and sold and furnished to Elk under the industrial sales contract between it and the plaintiff, not being a transaction in interstate commerce, is taxable by this State under the provisions of Section 2d.

The view hereinabove expressed with respect to Issue No. 10 and the approval of the ruling of the circuit court on that issue represent the opinion of the writer of this opinion who, as previously indicated, would affirm the action of the circuit court on that issue. With that view, however, Judges Browning, Calhoun and Caplan disagree. They are of the opinion that the transportation and delivery of the imported southwestern gas to du Pont, Elk and Kaiser are not interstate commerce, that the sales of such gas are local or intrastate transactions, and that the income derived from those sales is subject to the taxation provided by Section 2d; and they would reverse the action of the circuit court on Issue No. 10 and uphold the action of the defendant in levying the

tax of $776,340.48. Accordingly, the majority of this Court holds that the transportation of southwestern gas produced from wells in Texas and Louisiana, purchased by a utility operating in this State, part of which gas is transferred to such utility in its high pressure transmission lines at a point in this State and the other part of which gas is transferred to such utility in its high pressure transmission lines at a point outside this State, and all of which gas is transported direct from such points, after temporary delay in some instances in underground storage fields, to the plant of the consumer in this State where it is used and consumed, is not a transaction in interstate commerce. The sale of such gas to such consumer constitutes a local or intrastate transaction, is taxable by this State, and is not excluded from taxation by Section 2d, Article 13, Chapter 11, Code, 1931, as amended, which provides that the measure of such tax shall not include gross income derived from commerce between this State and other states of the United States or between this State and foreign countries.

Issues Nos. 12 and 13 relate to the penalties imposed by the defendant in the amount of $353,786.02, which the circuit court set aside and vacated. Issue No. 12 presents the question whether the failure of the plaintiff to remit the proper amount of the tax was due to reasonable cause within the meaning of Section 11, Article 13, Chapter 11, Code, 1931, as amended, which should have prompted the defendant to grant an unconditional waiver of such penalties instead of waiving them upon the condition that the plaintiff should pay the levied taxes within thirty days from the receipt of his ruling. Issue No. 13 presents the question whether the imposition of the penalties for failure of the plaintiff to remit the proper amount of the tax is prohibited by the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States and Article III, Section 10 of the Constitution of West Virginia. Inasmuch as the circuit court based its decision to vacate the penalties on Issue

No. 12 and did not directly decide Issue No. 13, that issue will not be considered or determined on this appeal.

In resolving Issue No. 12, the circuit court held that consideration by the predecessors of the defendant of many transactions similar to the transactions here under consideration which were not subjected to the same kind of taxes as the taxes here involved and the re-assessment by the defendant of the taxes originally levied against the plaintiff constituted reasonable cause for the defendant, in the exercise of the discretion vested in him, to waive the penalty for failure to remit the taxes assessed against the plaintiff, and that the imposition of the condition that the taxes be paid within thirty days upon which the waiver of the defendant was based, amounted to an abuse of discretion by the defendant.

Under the provisions of Section 11, Article 13, Chapter 11, Code, 1931, as amended, the tax commissioner is required to add specified penalties to the proper amount of the tax which a taxpayer fails to report, or fails to report and pay, but is authorized, if the failure is due to reasonable cause, to waive or remit such penalties. It is clear that a waiver of the penalty added for failure to pay the proper amount of the tax due by a taxpayer is in the sound discretion of the commissioner and that the exercise of such discretion is subject to judicial review.

It is evident, from the undisputed facts disclosed by the record, that the plaintiff, in failing to pay the tax levied by the commissioner and in challenging the correctness and the validity of the taxes upon some of the various activities of the plaintiff by its appeal from the reassessment by the commissioner to the circuit court and in prosecuting this appeal, was at all times acting in good faith. It is also manifest that the validity of the presently levied taxes on some of the transactions engaged in by the plaintiff had been rendered uncertain by the different positions of some of the predecessors of the defendant

from the present position of the defendant as to the taxability of transactions which some of his predecessors failed to tax or did not consider taxable. Moreover, the action of the commissioner in re-assessing the taxes in the present amount and in reducing the amount of the taxes as originally assessed; the granting of the waiver of the penalties upon the unreasonable condition that the presently levied taxes should be paid by the plaintiff within the specified period of thirty days, which was the identical period within which the plaintiff had the right to appeal the re-assessment; the absence of any statutory right of the plaintiff to pay the tax under protest and obtain a refund if the assessment should be erroneous in part or in its entirety; and the complex and difficult legal questions with respect to the validity of the taxes involved in the present levy, when considered singly or together, establish beyond question reasonable cause for the failure of the plaintiff to return or remit the taxes here involved at the time they became due and payable and were sufficient to warrant the commissioner, in the proper exercise of his sound but judicially reviewable discretion, to waive penalties imposed for the failure of the plaintiff to return and remit the proper amount of the taxes. The refusal of the commissioner, in the circumstances disclosed by the record, to grant a waiver of the penalties, except upon the unreasonable condition of the payment of the re-assessment of the taxes within the designated period of thirty days, constituted a clear abuse of the discretion vested in him by the statute. *Jewel Tea Company, Inc.* v. *State Tax Commissioner*, 70 N. D. 229, 293 N. W. 386; *In re Abbott's Estate*, 213 Minn. 289, 6 N. W.2d 466.

In *Walter Butler Building Company* v. *Soto*, 142 W. Va. 616, 97 S. E.2d 275, this Court said: "In a declaratory judgment proceeding the taxpayer institutes a suit against the State Tax Commissioner to determine the validity of an assessment of a tax against the taxpayer and his liability to pay the tax. In taking the appeal provided

by Section 8 of the statute the taxpayer proceeds against the State Tax Commissioner in the manner prescribed by Sections 7b and 8. The object and the purpose of each proceeding are to enable the taxpayer to controvert and present his defense against a tax previously assessed against him by the State Tax Commissioner which if valid and not challenged in either proceeding will become final and render him liable for its payment. The identical issue to be determined in each proceeding is the validity of the assessment of the tax and the liability of the taxpayer to pay the tax." It is evident that upon an appeal from an assessment by the tax commissioner of a tax, in which the validity of the assessment and the liability of the taxpayer to pay the tax are involved, the Court, as an incident to the determination of those questions, has the power and the authority to set aside and vacate any penalties imposed by the tax commissioner in the event the assessment of the tax in whole or in part is held to be erroneous or the tax commissioner has abused his discretion in refusing, upon a showing by the taxpayer of reasonable cause, to waive any penalty added to the tax and assessed against such taxpayer. See *State ex rel. Field* v. *United States Steel Corporation,* 143 W. Va. 375, 102 S. E.2d 354. In that case, in which one judge, being disqualified, did not participate, the unanimous decision of the four participating judges affirmed the judgment of the circuit court in setting aside and vacating in its entirety the penalties imposed against the taxpayer by the tax commissioner. This Court holds that when, upon appeal, the taxpayer shows reasonable cause for his failure to return or to pay the proper amount of the tax assessed against him and the tax commissioner refuses to waive any penalties imposed by him, the appellate court, in the exercise of its jurisdiction to hear and determine such appeal, may set aside and vacate any penalties imposed by the tax commissioner.

The action of the circuit court in upholding the tax levied and involved in Issues Nos. 4, 5, 6, 7, 8 and 9 is

affirmed; but by reason of its erroneous action in refusing to render judgment for the defendant for the tax levied upon the unmeasured free gas produced by the plaintiff and furnished the lessors as required by the leases held by the plaintiff involved in Issue No. 1, and in refusing to render judgment for the defendant for the tax levied upon the gas sold and delivered by the plaintiff to du Pont, Elk and Kaiser, involved in Issue No. 10, and because the judgment rendered by the circuit court for $92,249.23 is clearly insufficient in that it does not include all the tax which the defendant is entitled to recover, that judgment is reversed and set aside, and this proceeding is remanded to that court with directions that it render judgment in favor of the defendant and against the plaintiff for the full amount of the taxes levied against the plaintiff with interest from the date of such judgment and costs, and that the amount of all such taxes shall be determined in accordance with the principles enunciated in this opinion. But no penalty shall be assessed against the plaintiff and no judgment for any penalty shall be rendered against it in this proceeding.

Judge Berry, deeming himself disqualified, did not participate in the consideration or decision of this case.

*Affirmed in part;*
*reversed in part;*
*remanded with directions.*

CALHOUN, JUDGE, concurring:

I agree with the Court's decision in this case. The four judges who participated in the decision were in agreement on all questions presented for decision except, as the Court's opinion states, Judge Haymond was unable to agree with the three other judges in relation to Agreed Issue No. 10. He, as the author of the Court's opinion, has ample precedent among prior decisions of the Court for his having stated in the opinion the basis of his disagreement. Nevertheless, I deem it wise and proper to

state more fully that which I conceive to be the position of the majority in relation to this portion of the decision.

Agreed Issue No. 10, formulated while the case was in the trial court, is as follows:

"Does Tax Section 2d, in providing inter esse that 'The measure of this tax shall not include gross income derived from commerce between this state and other states of the United States.', thereby exclude from taxation under any Tax Section of the statute United Fuel's gross income from sales of gas under special industrial contracts directly from United Fuel's transmission pipelines to—

(a) E. I. du Pont de Nemours and Company,

(b) Elk Refining Company, and

(c) Kaiser Aluminum & Chemical Corporation

—in view of the particular facts, including the role of underground storage, involved in the sales and deliveries to each?"

By the brief filed in behalf of United Fuel Gas Company (which hereafter in this opinion may be referred to as United Fuel) and by the amici curiae brief, as well as by oral argument of counsel by whom such briefs were filed, it has been vigorously urged that the stipulated issue in question is not concerned with the question whether the tax involves the Commerce Clause of Article I, Section 8 of the Constitution of the United States. Indeed, counsel, by brief and oral argument, have displayed a degree of impatience with the action of counsel for the defendant in asserting that imposition of the tax here in question is not in violation of the Commerce Clause.

The Court's opinion makes clear that Agreed Issue No. 10 does not involve the constitutional question, but that it involves only the validity of the tax when considered in relation to the provisions of Code, 1931, 11-13-2d, as amended, a statute which provides for payment of a tax, commonly referred to as a Business and Occupation Tax,

"Upon any person engaging or continuing *within this state* in any public service or utility business, * * *." (Italics supplied.) The language relied upon by United Fuel is a sentence included in the statute which, so far as pertinent, is as follows: "The measure of this tax shall not include *gross income derived from commerce* between this state and other states of the United States * * *." (Italics supplied.)

Notwithstanding the narrow character of the question presented for decision by the language of Agreed Issue No. 10, the trial court, in its written opinion, held that the tax was in violation of the statutory provision and also that, under the decision in *State ex rel. Battle* v. *The Baltimore and Ohio Railroad Company,* 149 W. Va. 810, 143 S. E.2d 331, "the statute must be literally applied to exclude from the computation of the taxes, not only sales in interstate commerce which would, if taxed, clearly constitute an unreasonable burden thereon under the Constitution, but all gross income from any transaction in interstate commerce." I am of the opinion, as apparently was the trial court, that if it were held that the tax here in question represents a tax upon gross income derived from interstate commerce under the statute, it might with some reason be argued that, under the *Baltimore and Ohio Railroad Company* case, the tax is, as a matter of course, violative of the Commerce Clause. Nevertheless, the counsel for the taxpayers earnestly urge that the tax is in contravention of the statutory provision and yet strenuously insist that, in considering the validity of the tax, the Commerce Clause is not material in any sense or degree.

In relation to Agreed Issue No. 10, it is stated in the Court's opinion that the "finding of the trial court upon the undisputed facts" in this case is entitled to the same weight as the verdict of a jury and cannot be disturbed on this appeal "unless the evidence plainly and decidedly preponderates against such finding." *The State Road*

*Commission of West Virginia* v. *Oakes,* 150 W. Va. 709, 149 S. E.2d 293 and a prior case are cited in the Court's opinion in support of that proposition. I believe that this well-settled principle of law is not applicable to this case for the reason that the trial court's "finding" was based upon a stipulated, agreed state of facts and for the additional reason that the trial court's decision embodied purely a legal proposition arising from the construction of the statute and its application to the undisputed facts. *Dunning* v. *Barlow & Wisler, Inc.,* 148 W. Va. 206, 211, 133 S. E.2d 784, 788; *Lusher* v. *Sparks,* 146 W. Va. 795, 805, 122 S. E.2d 609, 615; *Rhinehart & Dennis Co., Inc.* v. *McArthur,* 123 Va. 556, pt. 15 syl., 96 S. E. 829; 5 Am. Jur. 2d, Appeal and Error, Section 825, page 267 and Section 826, page 268.

"In considering and deciding the constitutionality of a tax imposed and collected by this state, in the light of a provision of the Constitution of the United States, this Court is bound by applicable decisions of the Supreme Court of the United States, even though such decisions are inconsistent with prior decisions of this Court." *State ex rel. Battle* v. *B. D. Bailey & Sons, Inc.,* 150 W. Va. 37, pt. 2 syl., 146 S. E.2d 686. In deciding the question presented by Agreed Issue No. 10, we are not restricted by the legal proposition embraced in the quotation appearing immediately above, for the reason that this issue does not involve a constitutional question, but rather the application and effect of the clear language of the statute. 20 Am. Jur. 2d, Courts, Section 225, page 556; 21 C.J.S., Courts, Section 205, page 360. Decisions of the Supreme Court of the United States, therefore, are not directly in point, but are at most persuasive upon the question whether the business operations of United Fuel involved in Agreed Issue No. 10 are local in character and the question whether, in delivering and selling gas to the three industrial customers, United Fuel is earning "gross income derived from commerce between this state and other states of the United States * * *."

It was stipulated that "United Fuel has always been a natural gas company engaged in business in this State as a public utility subject to regulation and in fact regulated by the Public Service Commission of West Virginia * * *." Its "utility service territory" embraces an area in West Virginia shown on a map which was made a part of the stipulation. It was further stipulated that, in carrying out other objects and purposes, United Fuel has always been engaged, in areas of West Virginia, Kentucky and Ohio, in what the Natural Gas Act denominates a "natural gas company"; that, as such, it has been regulated since 1938 by the Federal Power Commission; and that "Certain other business activities of United Fuel are not regulated." It is further stated in the stipulation that "The Federal Power Commission has no statutory jurisdiction to regulate the price at which gas is sold to any of said special contract industrial customers."

It is undisputed that the three industrial consumers here in question are all located within the area of this state in which "United Fuel has always been a natural gas company engaged in business in this State as a public utility subject to regulation and in fact regulated by the Public Service Commission of West Virginia * * *."

In relation to Agreed Issue No. 7, United Fuel has contended that its sales of gas to all the special contract industrial consumers, including the three industrial consumers involved in Agreed Issue No. 10, constituted private, unregulated business authorized by the Public Service Commission of West Virginia in an exercise of a reviewable discretion and hence does not constitute "the supplying of public services" within the meaning of the statute; and that the measure of the tax prescribed by the statute for the business of "the supplying of public services" includes only gross income derived from utility services rendered under an official utility tariff. These contentions have been unanimously rejected by the Court in the decision of Agreed Issue No. 7. Ac-

cordingly, with respect to Agreed Issue No. 10, it cannot be validly asserted by United Fuel that it acts in any capacity other than as "a public utility subject to regulation and in fact regulated by the Public Service Commission of West Virginia" in making sales of gas to the three industrial consumers here in question, nor can United Fuel validly assert that its sales of gas to these three industrial consumers are not a part of its public utility business. United Fuel does not deny that its sales of gas, under its official utility tariff, to other industrial consumers in its public utility area of this state, with which industrial consumers it does not have special contracts, are sales made as a part of its activity as a public utility. United Fuel does not contend that its gross earnings from the sales of gas to these three industrial consumers are not a part of its gross income as "a natural gas company engaged in business in this State as a public utility * * *." United Fuel simply contends that these three industrial consumers fall into a different category for tax purposes merely on the basis of its assertion that gas is sold and delivered to them by its transmission lines rather than by its distribution lines, by means of which distribution lines gas is similarly sold and delivered by it as a public utility to other industrial consumers within this state, either under special contracts or under its official utility tariff schedule. It is clear that the bulk of the gas sold and delivered by United Fuel to consumers by means of its distribution lines likewise comes into such lines as a consequence of interstate commerce.

Counsel for United Fuel correctly assert that the language of Agreed Issue No. 10 involves only the provisions of the statute, but they rely solely on a single isolated sentence in that statute which is negative in character and at all times, in relation to that issue, they have avoided reference to the sentence following immediately thereafter which is affirmative in character. These two sentences are as follows: "The measure of this tax shall not include *gross income derived from commerce* between

this state and other states of the United States or between this state and foreign countries. *The measure of the tax under this section shall include only gross income received from the supplying of public services."* (Italics supplied.)

The first of the two sentences quoted above, the sole language of the statute upon which United Fuel rests its case in relation to Agreed Issue No. 10, merely represents, in my opinion, a legislative purpose to recognize fully the inhibition imposed upon the states by the Commerce Clause of the Constitution of the United States. Although United Fuel made a vigorous effort, under Agreed Issue No. 7, to escape the force of the second sentence quoted above, this Court, in deciding Agreed Issue No. 7 adversely to United Fuel, unanimously held that its sales of gas under special contracts to industrial consumers located within its utility service territory, to be used by such consumers in their several businesses, constituted a supplying of a public service within the meaning of the statute which, in clear and mandatory language, states that the measure of a tax under the statute "shall" include gross income received from "the supplying of public services." The phrase, "commerce between this state and other states", cannot be isolated and considered out of context. In seeking to determine the legislative intent, the statute here in question must be read and considered in its entirety.

In my judgment, United Fuel as a natural gas company engaged in business in this state as a public utility, does not earn a single dime as "gross income derived from commerce", either interstate or intrastate, in the sales of gas to these three industrial consumers. It is not engaged in any business by which it earns or undertakes to earn a gross income from engaging in commerce as such. It is a public utility engaged in the sale of gas to consumers for a profit. This represents the source of its "gross income", irrespective of the type of pipeline by

which the gas is sold and delivered to its consumers within its public service area of this state. The Court has held, on Agreed Issue No. 7, that the sales of gas by United Fuel to these three industrial consumers, located within United Fuel's public service area in West Virginia, are made by it as a part of its public utility business and that "gross income" thereby earned is earned by it as a public utility, and in no other capacity.

*State ex rel. Battle* v. *The Baltimore and Ohio Railroad Company,* 149 W. Va. 810, 143 S. E.2d 331, involved a railroad corporation which, of course, is engaged in the business of transporting goods for a profit in both interstate and intrastate commerce. That corporation, therefore, clearly receives "gross income derived from commerce between this state and other states". *Eureka Pipe Line Company* v. *The Public Service Commission of West Virginia,* 148 W. Va. 674, 137 S. E.2d 200, involved a public utility engaged in the business of transportation of petroleum by pipeline. That public utility also obviously received "gross income derived from commerce". These two business operations are, by their nature, character and purpose, clearly distinguishable from the business in which United Fuel is engaged. Its gross earnings here in question are not derived from commerce. On the contrary, its gross earnings, so far as Agreed Issue No. 10 is concerned, are derived from its business as a public utility engaged in the sale of natural gas to consumers within this state.

"Where a person claims an exemption from a law imposing a tax, such law must be construed strictly against the person claiming the exemption." *Owens-Illinois Glass Company* v. *Battle,* 151 W. Va. 655, pt. 3 syl., 154 S. E.2d 854. The statute here in question is intended to impose a tax upon "any person engaging or continuing within this state in any public service or utility business," with the exception of certain businesses therein defined. United Fuel clearly is not in the category of any of the types of public utilities excepted from the application of

the statute. The statute, I believe, is clear, unambiguous and mandatory in its provisions so far as this case is concerned. If the single sentence of the statute may be considered an exception to its general application, United Fuel has failed to sustain the burden of establishing that it falls within the purview of the exception or exemption for the reason that none of its earnings here in question constitute "gross income derived from commerce between this state and other states of the United States."

The essence of United Fuel's claim is, I believe, that the gas in question was received into United Fuel's pipeline and storage facilities as a consequence of its previous transportation in interstate commerce; and that the interstate character of the transportation was not changed or interrupted before the sale of such gas and the delivery thereof by transportation to and upon the premises of the three several industrial consumers through United Fuel's pipeline facilities. After delivery of the gas by United Fuel through its own pipelines which extended to and upon the premises of the three several industrial consumers, it was there metered by means of facilities belonging to United Fuel. There, upon the premises of each of the three several consumers, the gas was delivered, metered and sold. The gas belonged to United Fuel until it passed over the consumer's premises in each case and the sale and delivery of the gas was there finally consummated after the volume of gas had been determined by metering facilities owned by United Fuel. Transportation of the gas, or "commerce", was there terminated.

From the time and place gas was delivered into United Fuel's pipeline facilities, whether in this state or at a nearby point in Kentucky, the sale thereof to United Fuel had been fully consummated. Thereafter the gas was subject to its exclusive possession, control and ownership. From any of the points of delivery to United Fuel of gas which had reached such points as a consequence of prior interstate commerce, United Fuel, in the three instances here in question, was simply transporting its

own gas, in its own facilities and for its own business purposes as a public utility engaged in the delivery and sale of gas to consumers for a profit. It derives no "gross income" simply from the commerce aspect of transporting its own gas, for its own business purposes, through its own facilities. It receives its gross earnings from the ultimate sale of gas to the consumers within this state. Its gross income from the sales of gas to the three industrial consumers was not enhanced or otherwise affected by the incidental element of transportation which was essential in its business of sale and delivery of gas to the three industrial consumers.

"Interstate commerce continues as such until the goods shipped therein reach the point where the parties originally intended that the movement should finally end, and the further local movement by the consignee of the goods in furtherance of a valid business conducted by him constitutes intrastate commerce." *Gambino* v. *Jackson*, 150 W. Va. 305, pt. 3 syl., 145 S. E. 2d 124. The obligation of the prior shipper of the gas in interstate commerce was to deliver it to United Fuel, the consignee and purchaser of the gas. The subsequent transportation of the gas for sale to the three industrial consumers was a mere incident of United Fuel's local, intrastate business. The initial shipper or shippers of the gas to United Fuel had no privity of contract with the three industrial consumers.

The tax here in question has no relation to the sale and delivery of the gas to United Fuel by interstate commerce. The tax is not directed at prior transportation, sale and delivery of gas to United Fuel. The tax here in question is upon United Fuel's privilege of making sales of gas to consumers on a local, intrastate basis in West Virginia. The measure of the tax is based on gross income earned by United Fuel from sale of gas to consumers within this state in carrying on its local, intrastate business. This local transportation ends when the gas is delivered to each of the three industrial consumers for

consumption by it in its industrial operation. None of the gas involved in Agreed Issue No. 10 is transported by United Fuel from this state to any other state. The case in this respect is quite different from such cases as *West Virginia Pipe Line Co.* v. *State of West Virginia,* 95 W. Va. 285, 120 S. E. 759.

Taxes of this general character, imposed upon taxpayers doing business in this state, have been upheld notwithstanding the fact that interstate commerce is in some measure involved incidentally in the primary function of performance within this state of a business which is local and intrastate in character. A wholly incidental and minor involvement of interstate commerce does not destroy or alter the primary character of the performance of a business which is local and intrastate in its nature and purpose. *Gambino* v. *Jackson,* 150 W. Va. 305, 145 S. E.2d 124; *State ex rel. Battle* v. *B. D. Bailey & Sons, Inc.,* 150 W. Va. 37, 146 S. E.2d 686; *Norfolk and Western Railway Company* v. *Field,* 143 W. Va. 219, 100 S. E.2d 796; *Arslain* v. *Alderson,* 126 W. Va. 880, 30 S. E.2d 533.

For reasons stated, I am of the opinion that the gross income received by United Fuel from sales of gas to the three industrial consumers in question, under the stipulated facts of this case, does not involve "gross income derived from commerce between this state and other states of the United States"; that the income thus received by United Fuel is "gross income received from supplying public services", on a local, intrastate basis; and that, therefore, the tax in question was legally assessed by the defendant tax commissioner.

I have been authorized by Judge Browning and Judge Caplan to state that they agree with the views expressed in this concurring opinion.